[Civ. No. 6104. Fifth Dist. May 28, 1982.]

ANNA MARIE BEATIE, Plaintiff and Appellant, v.
MARIA SOCORRO DAVILA et al., Defendants and Respondents.

COUNSEL

Hawes & Keyes, Edward L. Hawes and Dwayne Keyes for Plaintiff and Appellant.

Perez, Makasian & Williams, Robert F. Perez, James M. Makasian and Robert Gray Williams for Defendants and Respondents.

OPINION

FRANSON, J.—

## INTRODUCTION

We treat herein a question of first impression under California law: May an absentee voter after marking his ballot, placing and sealing it in the identification envelope, filling out and signing the envelope, then lawfully hand the envelope to a *third party* for mailing to the elections official from whence it came? As we shall explain, we conclude the procedure described above complies with the provisions of Elections Code section 1013[1] which governs the return of absentee ballots. Nevertheless, because of the possibility of fraud or illegal activity by third persons in soliciting absentee ballots, we suggest the Legislature examine the general question of absentee ballot solicitation to see if remedial legislation is called for.

## THE EVIDENCE

On April 8, 1980, a general election was held in the City of Sanger to elect three members to the city council. Appellant was a candidate and failed to win reelection. Respondents each won a seat on the council and received the following votes: Jose Marquez, 1,381; Tanis Ybarra,

---

[1]Elections Code section 1013 provides: "After marking the ballot, the absent voter may return it to the official from whom it came by mail or in person, or may return it to any member of a precinct board at any polling place within the jurisdiction. The ballot must, however, be received by either the official or the precinct board before the close of the polls on election day.

"The official shall establish procedures to insure the secrecy of any ballot returned to a precinct polling place."

Unless otherwise indicated, all statutory references are to the Elections Code.

Jr., 1,338; and Maria Davila, 1,315. The appellant received 1,070 votes. The margins of victory of all three respondents over appellant resulted from the absentee votes cast. Four hundred sixty-six absentee votes were cast in the election. The pertinent breakdown of these votes is as follows: Jose Marquez, 395 absentee votes; Tanis Ybarra, Jr., 401 absentee votes; Maria Davila, 395 absentee votes; appellant, 45 absentee votes.[2]

Prior to the election, a campaign committee was formed to elect respondents to the city council. The committee set up headquarters and disbursed workers throughout the city to register people to vote for respondents. The committee actively solicited people to sign requests for absentee ballots. The committee members then returned to the voters' residences and picked up the ballots. Approximately 300 to 350 ballots were picked up from the voters. The ballots were then taken to campaign headquarters where lists were kept indicating which voters had requested absentee ballots. After checking off the voters' names on the list, the ballots were mailed to the Fresno County elections official.

At times, committee members went back three or four times to get a ballot from a voter. On a number of occasions, a committee member stood next to the voter while he or she voted and would indicate to the voter the names of the candidates the committee was supporting in the election; however, a committee member never marked the ballot or told the voter how to mark the ballot.

Appellant testified that Rudy Gurule, a member of respondents' committee, told her the committee had picked up 350 ballots and that appellant had 150 votes. Appellant asked Gurule, "How are you sure I got 150 votes?" and Gurule responded, "Well, um, I just figured you had 150 votes."[3]

---

[2]Five ballots were disallowed because they were not received on time. Four ballots were challenged and not counted because the identification envelope was not signed or the signature did not compare with the signature on the registration affidavit. Forty-nine absentee ballots simply were not returned.

[3]From this testimony, appellant seems to infer the committee members must have opened the identification envelopes to ascertain how the absentee voter had voted. However, there is no evidence that any ballots were opened or tampered with. The statement that appellant "had 150 votes" easily could have been grounded on the campaign workers' opinions of how the voters had voted.

Louie Sagura, the campaign committee chairman, testified that all of the absentee ballots picked up by committee members were returned to campaign headquarters and later mailed. He testified, "Never at any time were they tampered with, looked into or messed with in any way except to deliver them directly to the post office, which I did personally."

## DISCUSSION

The question is whether an absentee voter may utilize a third party to return his marked ballot to the elections official by mail. Stated more precisely, does section 1013 permit the absent voter to hand his sealed and signed identification envelope containing his marked ballot to a family member, friend or candidate's representative for mailing to the elections official, or must the voter *personally* deposit the identification envelope in the United States mail? The answer to this question requires an interpretation of the first sentence of section 1013 which provides, "After marking the ballot, the absent voter may return it to the official from whom it came *by mail or in person*, ..." (Italics added.)

Appellant contends the quoted language mandates that absentee ballots be returned by the voter *in person* to the elections official, either by delivering the ballot to the elections official or by personally depositing it in the United States mail. Appellant asserts this interpretation is required to assure the same degree of ballot secrecy on the ballot's return to the elections official as is established for the sending of the ballot to the absent voter. Section 1007 provides in part that if the official deems the applicant entitled to an absent voter's ballot, "he *shall deliver by mail or in person the appropriate ballot.*" Since approximately 350 absentee ballots in the Sanger election were returned by mail to the elections official by third parties rather than by the voters personally, appellant maintains the ballots were illegally cast, thereby requiring invalidation of the election.[4]

Respondents, on the other hand, contend that a rational interpretation of the quoted language of section 1013, with particular emphasis

[4]Section 20024 provides that an election shall be set aside on account of illegal votes if "it appears that a number of illegal votes has been given to the person whose right to the office is contested ..., which, if taken from him, would reduce the number of his legal votes below the number of votes given to some other person for the same office, ..."

on each word used therein allows the absent voter to authorize a third party, even a member of a particular candidate's campaign committee, to mail the ballot to the elections official.

■ The cardinal rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. Statutes must be given a fair and reasonable interpretation with due regard to the language used and the purpose sought to be accomplished. Where a statute is subject to two or more reasonable interpretations, that interpretation which will harmonize rather than conflict with other provisions of the act should be adopted. (58 Cal.Jur.3d, Statutes, §§ 83, 99, 106, pp. 431, 458, 481-482; see *People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322].)

■ We construe section 1013 to permit the absent voter to utilize a third party to mail his marked ballot to the elections official. The second clause of the first sentence of section 1013 expressly authorizes alternative methods of returning the ballot to the elections official, i.e., either (1) by mail, *or* (2) in person. Engrafting the words "in person" onto the first alternative ignores the disjunctive word "or" and imposes on the phrase "by mail" a meaning not indicated by the explicit language of the statute.

One may logically ask: Why would the Legislature require the voter to deliver his absentee ballot personally to the elections official and yet allow him to utilize a third party for mailing it to the official? We think the answer to the question is clear. The Legislature recognized the impossibility of policing the act of mailing by the absentee voter, i.e., the elections official would be unable to determine who in fact mailed the ballot—the voter or someone else. Recognizing the realities of absentee voting—that voters often entrust their ballots to family members or friends for mailing if it is convenient for them to do so—the Legislature realistically refused to impose a requirement that the absentee voter personally go to the mailbox.

Our interpretation of section 1013 is consistent with section 1001 which provides, "This division [absentee voting] shall be liberally construed *in favor of the absent voter*." (Italics added.) The latter provision was part of a legislative effort during the 1970's to expand voter participation by making the absentee ballot more accessible to the electorate.

(See Bolinger, Cal. Election Law During the Sixties and Seventies: Liberalization and Centralization, 28C West's Ann. Elec. Code (1977 ed.) pp. 119-126.) Liberal construction of the statutory procedures governing absentee ballots is but a part of the overall principle of construing election laws to uphold elections. (See *People* v. *City of Los Angeles* (1935) 9 Cal.App.2d 431, 438 [50 P.2d 101].)

We also observe that the forerunner of section 1013 (former § 14662) originally provided that the absentee voter had to deliver the ballot to the precinct board in person. In 1976, this requirement was deleted, thus allowing the absent voter the convenience of being able to authorize a third person to deliver his ballot to the precinct board. (Compare Stats. 1972, ch. 1356, § 9, p. 2704 with Stats. 1976, ch. 1275, § 18, p. 5658; see Bolinger, *op. cit. supra*, at pp. 122-123.) This change indicates the Legislature intended to permit the absentee voter to utilize third parties in returning the ballot to the elections official for counting.

Appellant fervently argues that permitting a third party to take possession of the absentee voter's marked ballot after the voter places it in the sealed envelope opens the door to widespread abuse of the voter's absolute right to a secret ballot. Appellant cites California Constitution article II, section 7 which states emphatically, "Voting shall be secret." In *Scott* v. *Kenyon* (1940) 16 Cal.2d 197, 201 [105 P.2d 291], the Supreme Court explains, "'these [election] statutes are designed to carefully protect the absent voter in his right to a secret ballot, which is the very foundation of our election system. Great care is taken to provide that, in handling and counting the absent voter's ballots, the same secrecy which surrounds the casting of regular ballots at the polls shall be preserved and maintained.'" In *Scott* the election inspector, contrary to the law, opened the envelopes in which the absentee ballots had been returned, removed the ballot and later returned the ballot to its envelope which was left unsealed. Unauthorized persons had the opportunity to tamper with the ballots prior to the official canvass. The Supreme Court found, "'Not only is it apparent that an opportunity for fraud existed, but it clearly appears that the secrecy of these particular ballots was destroyed.'" (*Ibid.*) The Supreme Court upheld the trial court's finding that the absent voter's ballots should not be counted.

The problem with appellant's secrecy argument in the present case is two-fold: First, unlike *Scott* v. *Kenyon, supra* 16 Cal.2d 197, there is no proof that the secrecy of any absentee voter's ballot was intruded upon

after the ballot was taken from the voter. The only time it could be said that the voter's right to secrecy was compromised was when the voter marked his ballot in the presence of the campaign representative before placing it in the identification envelope. ■ However, if a voter wishes to disclose his marked ballot to someone else, be it a family member, friend or a candidate's representative, he should be permitted to do so. To hold otherwise would cast a pall on absentee voting. We suspect that many absentee voters disclose their marked ballots to other persons before placing them in the identification envelope for return to the elections official or the polling place. Such a voluntary disclosure cannot be deemed to violate the constitutional mandate.

■ Nor do we think the mere potentiality for wrongdoing by the third party entrusted with the ballot is of sufficient danger to the secret ballot right to justify striking the ballot or, as in the present case, vitiating the election.

The elections statutes contain procedures to safeguard the secrecy of the absentee ballot once it is placed in the sealed envelope. Section 1009 provides that the identification envelope shall contain on its face a notice that the envelope contains an official ballot *and is to be opened only by the canvassing board* and a warning plainly stamped or printed on it that voting twice constitutes a crime.

Section 1015 provides that upon receipt of the absentee ballot the elections official shall compare the signature on the envelope with that appearing on the affidavit of registration and, if they compare, deposit the ballot, still in the identification envelope, in a ballot container. If the ballot is rejected because the signatures do not compare, the envelope shall not be opened, and the ballot shall not be counted. The cause of the rejection shall be written on the face of the identification envelope. We glean from the record before us that the elections official checks off on the application form each absentee ballot received so that a record is kept as to which ballots are returned. After the ballots are removed from the identification envelope, they are placed in a sealed ballot box.

All persons are, of course, subject to severe penal sanctions if they engage in fraud or tampering with a ballot. For example, it is a felony punishable by imprisonment in the state prison to aid and abet fraud in connection with a vote cast or to be cast (§ 29610), to interfere with

voters lawfully exercising their right to vote (§ 29612), to offer or promise to give consideration to induce a person to vote for a particular person or refrain from voting (§§ 29620-29624), or to use force, violence, intimidation or coercion to influence a voter (§ 29630).

We recognize that permitting a nonneutral party to handle absentee ballots before they are returned to the elections official opens the door to possible wrongdoing. Someone could ascertain how a person has voted by steaming open the ballot, and then tamper with the ballot itself and place it back in the envelope for resealing and mailing to the elections official. As the old maxim goes, "All's fair in politics."

Nevertheless, absent proof of fraud or tampering, or proof that the sealed envelope has been opened or its contents otherwise viewed by a third party before its return to the elections official, the mere possibility of wrongdoing and intrusion into the secrecy of the ballot does not suffice to vitiate either the ballot or the election. As explained in *Matter of Rodriguez* (Mo. 1977) 558 S.W.2d 356, 360: "No authority is cited and none has been found which would authorize the invalidation of an absentee ballot on the basis of speculation. Apparently Rodriguez would invalidate these ballots on the premise the notary could have opened the envelope containing the absentee ballot and could have changed the marking on the ballot before he mailed it to the election authority. However, this is entirely speculation and no proof whatever was introduced to show that any ballot was tampered with in any fashion or that any actual wrongdoing whatever occurred. Not only is there an absence of any proof of wrongdoing, but it should be remembered the court expressly found no evidence of fraud or wrongdoing. In this circumstance, this court certainly may not void otherwise valid ballots simply for the reason that the procedure followed here would afford opportunity for the perpetration of fraud in the future."

We close our opinion by observing that the technique of campaign organizations soliciting absentee ballots from prospective supporters did not originate in the present case. As noted by Bolinger, *op. cit. supra*, at pages 121-122: "This practice began at least as early as 1958 with mass mailings containing absentee ballot applications (or requests for applications) being sent by candidates to voters of their party. Sometimes the campaign would arrange to have absentee ballot applications mailed to the campaign headquarters rather than directly to the election officials in order to obtain information on who would be voting by

absentee ballot. This could result in serious delays in transmitting the applications to the election officials. In addition, there were charges that some campaign-generated applications were deliberately not delivered to the election officials in the case of voters who were apparently supporting the political opposition.

"The Legislature did little to regulate these practices."

Nevertheless, because of the potential for wrongdoing, we suggest the Legislature reexamine the practice of absentee ballot solicitation to see if section 1013 should be amended to provide that the ballot shall be returned to the elections official by the voter personally whether by mail or hand delivery, and if it is not so returned, it shall not be counted in the election. We express no opinion on this question.

The judgment is affirmed.

Brown (G. A.), P. J., and Zenovich, J., concurred.