[No. S.F. 24814. Aug. 21, 1986.]

GERTRUDE WILKS et al., Plaintiffs and Appellants, v.
BARBARA A. MOUTON et al., Defendants and Respondents.

402

**COUNSEL**

Paul N. McCloskey, Jr., Patricia S. Brody and Brobeck, Phleger & Harrison for Plaintiffs and Appellants.

Thomas P. Fox, District Attorney, Thomas Daniel Daly, Assistant District Attorney, Thomas R. Adams, Ann Broadwell and Adams, Broadwell & Russell for Defendants and Respondents.

**OPINION**

**THE COURT.**\*—Appellants seek to invalidate a municipal incorporation election on the ground that there were irregularities in the handling of certain absentee ballots. The trial court found that there had been no violation of any mandatory provision of the Elections Code or tampering with or fraud involving the ballots, and it confirmed the passage of the incorporation measure. We agree.

On June 14, 1983, the San Mateo County Board of Supervisors declared that a measure to incorporate the community of East Palo Alto had passed by a margin of 15 votes: 1,782 voters being in favor and 1,767 opposed. Two hundred seventy-two votes were cast by absentee ballot; these ballots favored incorporation by a ratio of nearly two to one. Appellants filed a statement of contest on grounds of misconduct by election officials and illegal voting, challenging 147 votes. In addition, the County of San Mateo filed a statement contesting three votes on residency grounds. The trial court rejected appellants' challenges to all but five votes which were cast by nonresidents. The court also invalidated the three votes challenged by the county, and confirmed passage of the incorporation measure by a margin of thirteen votes, as well as election of four challenged city council members.

Appellants assert that at least 94 of the absentee ballots were illegally cast because of the manner in which the ballots were obtained and delivered,

---

\*Before Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Lucas, J., and Sing (Lillian Kwok), J.†

†Judge, San Francisco Municipal Court, assigned by the Chairperson of the Judicial Council.

because there had been a breach of the right of secret balloting, and because of the alleged nonresidence of certain voters.

■ "It is a primary principle of law as applied to election contests that it is the duty of the court to validate the election if possible. That is to say, the election must be held valid unless plainly illegal. [Citations.] Accordingly, a distinction has been developed between mandatory and directory provisions in election laws; a violation of a mandatory provision vitiates the election, whereas a departure from a directory provision does not render the election void if there is a substantial observance of the law and no showing that the result of the election has been changed or the rights of the voters injuriously affected by the deviation. [Citations.]" (*Rideout* v. *City of Los Angeles* (1921) 185 Cal. 426, 430 [197 P. 74].) Even mandatory provisions must be liberally construed to avoid thwarting the fair expression of popular will. (*Kenworthy* v. *Mast* (1903) 141 Cal. 268, 271 [74 P. 841]; *Willburn* v. *Wixson* (1974) 37 Cal.App.3d 730, 736 [112 Cal.Rptr. 620].) In addition, there is an express legislative policy requiring liberal construction of absentee ballot provisions in favor of the absent voter. (Elec. Code, § 1001.)[1] ■ The contestant has the burden of proving the defect in the election by clear and convincing evidence. (*Smith* v. *Thomas* (1898) 121 Cal. 533, 536 [54 P. 71]; *Hawkins* v. *Sanguinetti* (1950) 98 Cal.App.2d 278, 283 [220 P. 58]; *Willburn* v. *Wixson, supra,* 37 Cal.App.3d at p. 737.) ■ We are, of course, bound by the trial court's determination of the facts except to the extent that they are not supported by substantial evidence. (*Wilburn* v. *Wixson, supra,* 37 Cal.App.3d 730, 737; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)

A. *Delivery of Absentee Ballots.*

■ Fifteen voters submitted applications for absentee ballots[2] and listed the residence or business address of Joseph Goodwill[3] as the place to which the ballot should be mailed. The county clerk mailed the ballots to the

---

[1]All statutory references are to the Elections Code.

[2]Any registered voter may vote by absentee ballot: he or she must file an application "signed by the applicant . . . show[ing] his place of residence." (§ 1002.) The application must contain, among other things, the printed name and residence address of the voter as it appears on the affidavit of registration, the address to which the ballot is to be mailed and the voter's signature. (§ 1006.) On timely receipt of the application, the elections official "should determine if the signature and residence address on the ballot application appear to be the same as that on the original affidavit of registration." (§ 1007, subd. (a).) Then, "[i]f the official deems the applicant entitled to an absent voter's ballot he or she shall deliver by mail or in person the appropriate ballot." (§ 1700, subd. (b).)

[3]Joseph Goodwill is president of the East Palo Alto Chamber of Commerce and a well-known member of the community who was active in favor of incorporation. He was not an official member of the East Palo Alto Citizens Committee on Incorporation (EPACCI), a group formed to promote the incorporation of East Palo Alto.

specified addresses. Eight voters picked up their ballots at Mr. Goodwill's office. Two voters who were relatives of Mr. Goodwill picked up their ballots at his home. Mr. Goodwill delivered the remaining five ballots to voters at their homes.

Appellants argue that these 15 ballots should not be counted because the clerk violated section 1007, which provides in pertinent part that "[i]f the official deems the applicant entitled to an absent voter's ballot he or she shall deliver by mail or in person the appropriate ballot." Appellants argue that this provision requires that ballots be mailed only to the voter's residence, and that it prohibits third parties from delivering the ballot to the voter.

Appellants' contention that section 1007 prohibits the election official from mailing a ballot to a qualified voter at an address other than his residence is plainly meritless. Nothing in section 1007 indicates such a requirement. In fact, related sections of the absentee ballot provisions specifically allow the voter to name a mailing address different from his residence. (See §§ 1006 [absentee ballot application must provide for residence address and address to which the ballot is to be mailed], and 1451 [applicant for permanent absent voter status must indicate address where ballot is to be mailed, if different from the place of residence].)

Also unpersuasive is appellants' argument that a third party whose address the voter has specified for delivery of his ballot may not deliver the absentee ballot to a voter. Appellants can point to no specific provision prohibiting third-party delivery when the voter has directed the election official to deliver his ballot to an address other than his residence. They refer us to an opinion of the Attorney General finding that section 1007 does not authorize delivery of absentee ballots to "authorized representatives" of the voter; we remain unpersuaded. The Attorney General stated that because section 1017 specifically allows delivery of absentee ballots to third-party designated representatives when a disabled or absent voter missed the usual time limit for applying for an absentee ballot, the Legislature must have intended that this third-party delivery not be available when the voter meets the deadline. (62 Ops.Cal.Atty.Gen. 439, 442 (1979).) We find this interpretation of legislative intent inconsistent with the Legislature's caveat that the absentee-voter provisions be interpreted liberally in favor of the absent voter. (§ 1001.) The Legislature clearly contemplated that the voter could choose to receive his absentee ballot at a place other than his residence; naturally this choice could mean that a person other than the voter would actually receive the ballot. Since the Legislature authorized voters to receive ballots at a place other than their residence, we can assume that the Legislature anticipated that in some cases a third party would convey the ballot to the voter. We

certainly cannot find any mandatory provision the breach of which would permit disenfranchising these 15 voters. As the trial court found, each of these voters actually received his or her absentee ballots and there was no tampering with them. We recognize that there is some potential for abuse if campaign workers and candidates gain undue control of the distribution of absentee ballots, but elimination of this risk is a legislative task.

B. *Ballots Voted in the Presence of or With the Assistance of Incorporation Proponents.*

■ Appellants contend that the secret voting provision of the California Constitution[4] was violated in the case of 45 absentee ballots voted in the presence of or with the assistance of 3 incorporation proponents. Appellants further allege that the conduct of the three incorporation proponents constituted criminal interference with the secrecy of voting in violation of section 29645.[5]

Joseph Goodwill distributed approximately 79 absentee ballot applications. He later visited many of these people and asked whether the ballot had been received, and whether the voter had completed and returned the ballot to the county clerk. In most cases the voter was either a member of Mr. Goodwill's family or a friend of long standing.

The trial court adopted the following findings with respect to the voters assisted by Mr. Goodwill: "In some instances the voter asked Mr. Goodwill for instructions about the absentee ballot procedure. In some instances, because of age, physical disability or lack of familiarity with the computer card, the voter asked Mr. Goodwill for help completing the absentee ballot. In yet other instances, the voter had completed the ballot and gave it to Mr. Goodwill to return to the County Clerk. In some instances the voter had already completed and returned the absentee ballot to the County Clerk. In those instances where Mr. Goodwill helped complete the absentee ballot, he did so in privacy, in the presence of the voter, with the voter's understanding and consent. Occasionally, one or more members of the voter's family were present, with the voter's consent. All the ballots were punched to reflect the voter's decision on the candidates and on [the incorporation

---

[4]Article II, section 7 states: "Voting shall be secret."

[5]Section 29645 provides: "Any person is guilty of a felony, punishable by imprisonment in a state prison for two, three, or four years who, before or during an election: [¶] (a) Tampers with, interferes with, or attempts to interfere with, the correct operation of, or willfully damages in order to prevent the use of, any voting machine, voting device, voting system, or vote tabulating device. [¶] (b) Interferes or attempts to interfere with the secrecy of voting. [¶] (c) Knowingly, and without authorization, makes or has in his or her possession a key to a voting machine that has been adopted and will be used in elections in this state."

measure]. After the ballot was completed, each voter signed the ballot envelope.''

Mrs. Carmaleit Oakes is a 77-year-old retired school teacher who was active in EPACCI. She visited five voters, some of whom apparently had requested assistance from EPACCI in completing their absentee ballots.

The trial court adopted the following findings with respect to the voters assisted by Mrs. Oakes: "[Mrs. Oakes] was invited into their homes. She offered to help them with their absentee ballots. They all accepted her offer. All five people discussed their votes with her and voluntarily showed their ballot materials to her. At their request, because of lack of familiarity with the computer card, she helped four voters complete their absentee ballots in the privacy of their own homes. She helped complete all four ballots with the voters' understanding and consent and in accordance with the voters' wishes. Each completed ballot correctly reflected each voter's choice of candidates and each voter's decision on [the incorporation measure]. After the ballot was completed, each voter signed the ballot envelope. . . . The fifth voter . . . completed her own absentee ballot. . . . Mrs. Oakes took the completed ballots of these five voters to EPACCI headquarters. No one tampered with any of these ballots.''

Mr. Frank Omowale Satterwhite is a former chairman of the San Mateo County Planning Commission, a member of the East Palo Alto City Council and the owner of a consulting firm. He was an active member of EPACCI, and his name appeared on the ballot as a candidate for city council. Mr. Satterwhite assisted several voters residing at Runnymede Gardens, a federally subsidized senior citizens residential facility. Following a request by several residents for help with their absentee ballots, Brad Davis, the resident manager of Runnymede Gardens, asked that a representative of EPACCI come to the facility to explain the absentee voting process.

The trial court adopted the following findings with regard to the voters assisted by Mr. Satterwhite: "Mr. Frank Omowale Satterwhite came to Runnymede Gardens for the meeting and helped six voters with their absentee ballots. All six voters requested help. All who showed their ballots to Mr. Satterwhite did so voluntarily. Four of these people asked Mr. Satterwhite to complete their absentee ballots. Because of age or disability, they could not punch out the holes in the absentee ballot computer cards themselves. . . . Mr. Satterwhite caredully [*sic*] ascertained their wishes, punched out the ballots according to the voter's instructions and showed the punched

ballot to the voter.[6] Mr. Satterwhite's assistance was provided with the voters' understanding and consent, and the voters all signed the ballot envelopes. Mr. Satterwhite gave these absentee ballots to Brad Davis, along with those of [two other residents] who completed their own ballots.''

The trial court found that in each case where an incorporation proponent had assisted a voter in completing an absentee ballot, the assistance had been provided at the voter's request. The court also found that the assistance had been provided without fraud or coercion, and that all disclosures had been made voluntarily by the voter. Finally, the court concluded that no ballot had been tampered with, and that in all cases the vote cast reflected the decision of the voter.

These factual findings are supported by substantial evidence and will not be disturbed on appeal.[7] Appellants argue that even accepting the trial court's findings as true, the intrusion by campaign workers on the secrecy of voting requires that the ballots be invalidated even where disclosures are voluntary and in the absence of tampering. We disagree.

■ Article II, section 7, of the California Constitution states: "Voting shall be secret." This does not mean that every ballot including absentee and mailed ballots must actually be cast in secret; we recently rejected such an argument in *Peterson* v. *City of San Diego* (1983) 34 Cal.3d 225 [193 Cal.Rptr. 533, 666 P.2d 975]. In that case plaintiffs argued that an election conducted by mail ballot is invalid because the voter in such an election may show his ballot to another person. We noted that with respect to protection of the secrecy of the ballot, provisions for mail balloting and absentee balloting are substantially the same, and that the absentee ballot provisions have been held consistent with the constitutional provision. (*Id.,* at pp. 228, 231; see *Beatie* v. *Davila* (1982) 132 Cal.App.3d 424, 431 [183 Cal.Rptr. 179].) We emphasized the fundamental nature of the right to vote and noted the efforts of the Legislature to extend the exercise of the franchise by enacting liberal provisions for voting by absentee ballot. "We are satisfied

---

[6]Mr. Satterwhite testified that he was especially sensitive to the fact that he was assisting voters with ballots on which his own name appeared as a candidate. In order to avoid "any aura of impropriety" he refused to respond to any questions regarding the candidates and simply referred the voters to their election materials. He did not advise any voter as to how his or her vote should be cast.

[7]Although appellants never directly attack the trial court's factual findings, they quote extensively from testimony which in the trial court they argued was evidence of improper conduct. Although the evidence presented at trial was sharply conflicting, we must consider the evidence in the light most favorable to the prevailing party, giving such party the benefit of every reasonable inference, and resolving all conflicts in support of the judgment. (9 Witkin, Cal. Procedure, *supra,* Appeal, § 278, p. 289.) The trial court's findings here are clearly supported by substantial evidence.

that the secrecy provision of our Constitution was never intended to preclude reasonable measures to facilitate and increase exercise of the right to vote such as absentee and mail ballot voting. We may not assume that the secrecy provision was designed to serve a purpose other than its obvious one of protecting the voter's right to act in secret, when such an assumption would impair rather than facilitate exercise of the fundamental right." (34 Cal.3d at p. 230.)

Two Court of Appeal opinions recognize that absentee ballots validly may be cast in the presence of or with the assistance of third parties. In *Fair* v. *Hernandez* (1981) 116 Cal.App.3d 868 [172 Cal.Rptr. 379], the court refused to invalidate two absentee votes cast with the assistance of family members, when the voters were partially physically disabled. The court held that the statutory restrictions on who may provide assistance to disabled voters at polling places do not apply to absentee voting. (*Id.*, at p. 879; see §§ 14234, 14235, 14236.) And in *Beatie* v. *Davila, supra,* 132 Cal.App.3d 424, the Court of Appeal rejected a challenge to absentee votes cast in the presence of partisan campaign workers. In that case, defendant's campaign committee conducted an aggressive absentee ballot campaign, soliciting people to sign requests for absentee ballots and then returning to the voters' residences to pick up the ballots. The court held that the conduct of the committee members did not violate the voters' right to secrecy: "[I]f a voter wishes to disclose his marked ballot to someone else, be it a family member, friend or a candidate's representative, he should be permitted to do so. To hold otherwise would cast a pall on absentee voting. We suspect that many absentee voters disclose their marked ballots to other persons before placing them in the identification envelope for return to the elections official or the polling place. Such a voluntary disclosure cannot be deemed to violate the constitutional mandate." (*Id.*, at p. 431.)

Appellants argue on the basis of our opinion in *Scott* v. *Kenyon* (1940) 16 Cal.2d 197 [105 P.2d 291], that when there has been a breach of secrecy and an opportunity for fraud in the collection of absentee ballots, the ballots must not be counted. But *Kenyon* does not help appellants. There, the voters did not waive the right to a secret ballot. It was election officials who violated that right after the voters had turned their ballots in. An election official removed identifying tags from absentee ballots which had already been delivered to the clerk, opened them and read off the name of the voter and the votes cast without allowing anyone to corroborate his reading, and put the ballots and envelopes in an insecure ballot box. This box was actually tampered with and ballots were removed before the votes could be canvassed. These procedures violated statutory provisions for the storage, counting and secrecy of ballots once received by election officials. It was not merely the opportunity for fraud, but these wholesale violations, along with the evi-

dence of actual tampering and the impossibility of determining with certainty how the challenged votes had been cast that compelled us to conclude that the absentee ballots could not be counted. (*Id.,* at pp. 201, 203-204.)

The statutory provisions regulating absentee voting do not prohibit the voter from permitting third parties to be present while the voter marks his ballot. Neither do these provisions specify what class of absentee voter may use third parties to actually mark the ballot. The trial court found that each voter had voluntarily allowed the campaign workers to be present while the voter marked the ballot, and had requested whatever assistance was provided in marking the ballots. The trial court found that each ballot was marked as the voter had requested and that there was no coercion or tampering. Appellants' request that we nonetheless invalidate each of the votes cast because it was not cast in secret is inconsistent with our obligation in reviewing a contested election to protect the individual's exercise of the franchise in the absence of manifest illegality.

We realize that the integrity of an election is impaired when partisan campaign workers coerce absentee voters to give up their right to vote in secret. But the trial court determined upon the basis of substantial evidence that no such coercion occurred here. As we noted in *Peterson,* the Legislature has adopted criminal sanctions to secure the integrity of elections. "It is a crime to interfere with a voter lawfully exercising the right to vote at an election (Elec. Code, § 29612), to offer employment or any gift or lodging as an inducement for voting or refraining from voting (Elec. Code, §§ 29620-29624), to coerce or to intimidate any voter (Elec. Code, § 29630) or to interfere with the secrecy of voting (Elec. Code, § 29645)." (*Peterson v. City of San Diego, supra,* 34 Cal.3d at p. 231.)[8] In addition, the Elections Code prescribes rules intended to assure the secrecy and integrity of absentee ballots. (See, e.g., §§ 1009 [notice on absentee ballot envelope that it is to be opened only by canvassing board], 1015 [election official to compare signature on absentee ballot envelope with signature on affidavit of registration]; see also § 17007 [any ballot marked by voter so that it can be identified as his shall not be counted].) If it is perceived that there are defects or ambiguities in the legislative scheme for absentee voting which leave a potential for abuse, the Legislature must respond.

C. *Ballots Delivered to the Elections Official by a Third Party.*

 Several EPACCI members accepted completed absentee ballots from various voters and delivered them to EPACCI campaign headquarters. On-

---

[8]We accept the trial court's determination that no such coercive activity took place here.

yango Bashir, Chair of EPACCI's voter registration committee, personally delivered 46 ballots to the ballot box on the counter in the county clerk's office between May 9, 1983, and May 24, 1983. The ballots were not tampered with. The deputy county clerks in charge of the room allowed voted absentee ballots to be deposited in the ballot box by anyone. On May 24, 1983, the assistant county clerk informed the deputy clerks that absentee ballots could only be delivered by the voter. He had been aware of this rule on May 9 but had not had time to tell the clerks before. On the same day the deputy clerks told Mr. Bashir that he could not place the voted absentee ballots in the ballot box, but would have to mail them. He took them outside the building, put stamps on them and put them in the mailbox. Mr. Bashir was during this time a deputy county clerk deputized to assist in the conduct of elections; the county clerk administered an oath of office but did not instruct him how to handle absentee ballots or that he could not personally deliver them to the ballot box.

Appellants contend that the 46 absentee ballots which Mr. Bashir personally delivered to the ballot box must be invalidated because they were delivered in violation of section 1013. They also challenge the ballot cast by Lanette Cody whose sister delivered her ballot to an election official.

Section 1013 provides in pertinent part: "After marking the ballot, the absent voter may return it to the official from whom it came by mail or in person, or may return it to any member of a precinct board at any polling place within the jurisdiction." We agree with appellants that section 1013 directs the voter to return the completed ballot personally if he decides not to use the mail, and that the section does not contemplate the voter's use of a third party to deliver the ballot. (See *Fair* v. *Hernandez* (1982) 138 Cal.App.3d 578 [188 Cal.Rptr. 45] [*Fair II*]; see also *Peterson* v. *City of San Diego, supra,* 34 Cal.3d 225, 228 and *Beatie* v. *Davila, supra,* 132 Cal.App.3d 424, 429.) We do not agree, however, that the voters' and deputy county clerks' inadvertent violation of this provision requires that we disenfranchise the voter in the face of a trial court finding that there was no fraud or tampering with the challenged ballots. As we said above, the trial court found that in each case the third party delivered the ballot at the voter's request and after the voter had signed and sealed the envelope and that there was no tampering. The deputy clerks accepted all the ballots because their supervisor had not had time to tell them not to accept them from third parties.

We do not agree with the Court of Appeal in *Fair II* that the bar to third-party delivery of absentee ballots is so fundamental to the preservation of the integrity of elections that we must invalidate an absentee ballot delivered by a third party in the face of a trial court determination that there has been

no fraud or tampering. We note that third parties are permitted to mail absentee ballots for the voter or deliver ballots to the polling place on election day, and that this is not considered to undermine the integrity of elections.[9] (*Beatie v. Davila, supra,* 132 Cal.App.3d 424, 429; Bolinger, Cal. Election Law During the 60's and 70's: Liberalization and Centralization, 28C West's Ann. Elec. Code (1977 ed.) p. 123.) Disabled absentee voters who miss the deadline for requesting absentee ballots by mail may designate an authorized representative to receive the blank ballot and return the completed ballot to an elections official or polling place. (§ 1017.) The Legislature evidently did not consider that this form of third-party delivery would undermine the integrity of elections.

We regard section 1013 as essentially directory in nature. We do not believe that it "goes to the substance or necessarily affects the merits or results of the election." (*Rideout v. City of Los Angeles, supra,* 185 Cal. 426, 431.) Noncompliance with directory provisions of the Elections Code will not nullify a vote unless the irregularity prevented "'the fair expression of popular will'" (*Canales v. City of Alviso* (1970) 3 Cal.3d 118, 127 [89 Cal.Rptr. 601, 474 P.2d 417]) or the "result of the election has been changed or rights of the voters [were] injuriously affected by the deviation." (*Rideout v. City of Los Angeles, supra,* 185 Cal. at p. 430.) The trial court's findings clearly show that neither occurred here. Under these circumstances, where there has been no fraud, tampering or coercion, departure from the technical requirements of the statute will not disenfranchise voters who had no knowledge that they had failed to comply.

D. *Other Challenges.*

■ Appellants originally challenged 115 votes for alleged residence violations, but reduced this number to 39 near the end of trial. The trial court sustained five of these challenges and denied the remainder. Appellants renew their residency challenge to 17 votes. This challenge turns on factual determinations properly made by the trial court. The court determined that appellants had failed to prove that any of the 17 voters had lost his or her domicile in the precinct in which he or she was registered before the election. Substantial evidence supports the trial court's finding.

---

[9]This is a perfect illustration of the injustice in nullifying votes because of noncompliance with technical and sometimes ambiguous rules governing the absentee balloting process. When Mr. Bashir was informed at the clerk's office that the office would no longer accept ballots delivered by third parties, he simply walked outside and deposited the ballots in a mailbox. According to appellants, had Mr. Bashir handed these ballots to the clerk instead of putting them in the mailbox, the integrity of the elections process would have been compromised to a degree requiring invalidation of the ballots. We do not think the expression of popular will should be nullified in such an arbitrary manner.

Appellants also challenge 16 ballots returned in envelopes where the residence address did not match the address on the voter's affidavit of registration. We agree with the trial court that section 1015 requires only that the elections official compare the signature on the identification envelope with the signature on the affidavit of registration; a comparison of addresses is not required.[10]

The trial court determined that there had been no fraud, coercion or tampering in connection with any of the challenged ballots. The court determined that every voter who had disclosed his ballot to a third party had done so voluntarily. Most voters who disclosed their ballots did so because they needed help in view of their age, infirmity or illiteracy. There was substantial compliance with the essential provisions of the absentee voter provisions of the Elections Code. Under these circumstances we will not deprive the individuals who cast the challenged ballots of the exercise of their fundamental right to vote.

The judgment is affirmed.

**GRODIN, J.,** Concurring.—In my concurring opinion in *Peterson* v. *City of San Diego* (1983) 34 Cal.3d 225, 231 [193 Cal.Rptr. 533, 666 P.2d 975], I expressed concern, based upon the state constitutional mandate that "voting shall be secret," with forms of election which permit persons other than the voter to observe the ballot as it is cast. The problem inherent in such systems, I suggested, "is not simply one of purchasing votes, though a market in that commodity is far more likely if the buyer can see what he is getting. The problem includes the potential for more subtle forms of coercion. . . . [I]t is inevitable that political and special interest groups will be tempted to 'assist' voters in casting their ballots, perhaps at organizational parties at which the marking and mailing of ballots constitute a group activity." (*Id.,* at p. 232.)

This case presents a vivid illustration of the problem I described. In a local election, with a small and almost equally divided electorate, a number of ballots three times greater than the margin of ballots counted were cast by absentee voters in the presence of or with the assistance of campaign partisans, one of whom was actually a candidate, and under circumstances bound to give rise to the suspicion if not the actuality of coercion.

The state Constitution contemplates that absentee voting will occur, and that the Legislature will have broad power over its regulation (see *Peterson*

---

[10]Section 1015 provides in pertinent part: "Upon receipt of the absentee ballot the elections official shall compare the signature on the envelope with that appearing on the affidavit of registration and, if they compare, deposit the ballot, still in the identification envelope, in a ballot container in his or her office."

v. *City of San Diego, supra,* 34 Cal.3d at pp. 228-229). Certainly we could not properly say that the constitutional demand for secrecy in voting is violated every time an absentee voter obtains physical assistance in filling out his ballot; some voters require such assistance in order to be able to vote. The trial court found that was in fact the situation in the case of voters who were so assisted in this case, and I agree with the majority that there was sufficient evidence to support those findings. For these reasons I concur. I strongly suggest, however, that there is a need in this arena for prophylactic rules which the Legislature is in the best position to provide.