[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On September 15, 1992, a Democratic primary was held in New Haven to determine the Democratic candidate for the 95th Representative District of the Connecticut General Assembly. The two candidates were the plaintiff Janette Parker, the incumbent State Representative for the 95th District, and the defendant Andrea Jackson Brooks, who was the Democratic endorsed candidate for the 95th District. After the votes on the voting machine were tallied, the plaintiff Janette Parker appeared to be the winner. However, after the absentee ballots were counted and the total vote from both the machines and the absentee ballots was tallied, the defendant Brooks was the winner by thirty-nine votes. Parker has brought this action pursuant to Conn. Gen. Stat. 9-329a alleging that certain laws relating to primary elections and the casting of absentee ballots were violated. The principal relief she seeks is an order from the court that a new primary be held. In addition to Brooks, the defendants include the Democratic registrar of voters, the New Haven town clerk and individuals who are alleged to have acted improperly with respect to the primary.
Conn. Gen. Stat. 9-329a provides that an action may be brought by any candidate who is "aggrieved" by a ruling of an election official, by any mistake in the count of the votes or by any violation of certain statutes relating to the primary or the casting of absentee ballots. The court finds that the plaintiff is aggrieved. She has alleged violations of the stated statutes, improper rulings by election officials and a mistake in the vote count, as a result of which she has been deprived of the Democratic nomination for the 95th District. The value of the Democratic nomination in a city with an overwhelming Democratic voter enrollment cannot be minimized. The plaintiff has established aggrievement.
CT Page 9564 The 95th District has within its boundaries several buildings limited in occupancy to the elderly and the handicapped. One, at 49 Union Avenue, has ninety-five apartments and is owned and operated by the New Haven Housing Authority. A second such complex is Tower One and Tower East, which are privately owned but subsidized under the 8 program of the Department of Housing and Urban Development. The "Towers", as they are called, contain hundreds of units. Many residents of 49 Union Avenue and the Towers voted in the primary by absentee ballot. These absentee ballots are the subject of several claims of impropriety by the plaintiff.
In order to vote by absentee ballot, a voter must complete and file an application for an absentee ballot. Conn. Gen. Stat.9-140. The Brooks campaign appointed Louis Aceto as its absentee ballot coordinator, charged with the responsibility to ensure that voters who wanted to vote by absentee ballot properly did so. Through the assistance of tenants who lived at the Towers and 49 Union Avenue, Aceto distributed applications for absentee ballots. A record was obtained which identified the tenants who had voted by absentee ballot in previous elections. Then an application for absentee ballot was prepared for each such tenant. Jacqueline Harrison, a Brooks supporter, and Milton Naiman, an officer of the Towers' Tenants Association who later voted for Parker, distributed the applications at the Towers. Evelyn Mikos, a Brooks supporter, distributed the applications at 49 Union Avenue. They filled in the tenant's name and address at the top of the form and also designated that the ballot should be mailed to the tenant at his or her mailing address, which the worker also filled in. The worker would then take the application to the tenant so the tenant could sign it. In addition, the worker would check the box indicating the tenant's reason for voting by absentee ballot. The most common reason was physical disability or illness. After the tenant signed the application, the worker would take the application from the tenant and return it to Aceto for filing with the town clerk. In many cases Aceto would check the application to make sure it was fully complete. If the application lacked the date of the primary or other information related to the election, Aceto would insert the missing information before filing the application.
The purpose of this absentee ballot assistance was to facilitate voting by the elderly and handicapped who resided in the Towers and at 49 Union Avenue. Almost one hundred votes were cast by absentee ballot in Ward 6B, where both complexes were CT Page 9565 located. This was the largest number of absentee ballots cast in any ward in the 95th District, and over sixty percent of the absentee votes were cast for Brooks.
It is important to note that this process was used for the application for the absentee ballot only, and not for the absentee ballots themselves. Although Aceto tried to have someone follow up with tenants to make sure they filled out and mailed their actual ballots, the effort in that regard was far less organized. Despite the concerted effort with respect to the absentee ballot applications, there was no evidence that the tenants applying for an absentee ballot were told for whom to vote. Although there were errors or misunderstandings with respect to a few of the absentee ballot applications, the vast majority of the applications were filled out correctly as the tenant wanted it. Each application was in fact signed by the tenant and there were no improprieties in that respect.
The plaintiffs' first claim with respect to these absentee ballots is that many of the tenants who cast the ballots did not qualify to do so because they were not "unable to appear" at a polling place during voting hours because of physical disability or illness. Conn. Gen. Stat. 9-135. To substantiate that claim, the plaintiff issued subpoenas to many of the tenants who filed absentee ballot applications, summoning them to testify at trial. Many of the tenants came to court to testify during the trial and plaintiff's counsel questioned them about their claimed disabilities or illnesses. Almost all of the tenants who came to court testified that they suffered from health problems, which included diabetes, high blood pressure, cataracts and other vision problems, arthritis and other orthopedic problems, and heart problems. Several of them were in their 80's and several used canes for assistance in walking. Most of the tenants testified that they were capable of going out of their apartments, although several testified that some days they feel well and other days they do not.
The plaintiff asks the court to interpret "unable to appear" at the polling place quite literally and to find that most of the absentee voters were in fact able to go to the polling place, in which case they had no right to vote by absentee ballot. The plaintiff argues that voting at the polls is the preferred method of voting because an election is defined as a "meeting" of the electors. Furthermore, there are protections for voters at the polls which do not exist with absentee voting: a prohibition of CT Page 9566 electioneering within seventy-five feet of the polls, the presence of sworn election officials and the privacy of the curtained voting machine. Moreover, she points out, state law now requires the polls to be handicap-accessible for the convenience of elderly or disabled voters. The plaintiff acknowledges having no authority in support of her request for strict interpretation of the statute.
The court finds no merit to the interpretation urged by the plaintiff for several reasons. First, it must be noted that absentee voting laws should be liberally construed. "In most jurisdictions absentee voting laws have been liberally construed so as to further their evident purpose of protecting and furthering the right of suffrage." "Construction and effect of Absentee voters' laws," 97 ALR 2d 243, 266. Connecticut shares in this view of liberal construction of voting statutes."`[N]o voter is to be disfranchised on a doubtful construction, and statutes tending to limit the exercise of the ballot should be liberally construed in his favor.'" Wrinn v. Dunleavy, 186 Conn. 125,142 (1982). The construction of "unable to go to the polls" which is urged by the plaintiff is not consistent with a liberal interpretation designed to further the right of suffrage. The court has had the opportunity to observe the tenant-absentee voters as they testified in this matter. Although not bedridden or limited to the confines of their apartments, many of them are frail and walk or move about only with difficulty. If they were deprived of the right to cast absentee ballots, many of them would not vote at all rather than going to the polls. A liberal construction of the absentee voting statute is necessary to preserve their right to vote.
A second reason to uphold the absentee votes is the nature of the representation made in the application. When a tenant signed an application for absentee ballot, he or she was declaring under the penalties of false statement that he or she "expected" to be unable to appear at the polling place during the primary. In a case very similar on the facts with the pending case, a New York court found that the issue was "not whether a voter was actually disabled but whether the application was made in good faith that the voter would be disabled." Cristiano v. Otsego County Board of Elections, 581 N.Y.S.2d 872, 873 (1992). The issue, said the court, "is not the voter's physical capabilities on the day of the election, but rather the voter's expectations at the time of applying for an absentee ballot." Id. Given the various health problems of the absentee voters who CT Page 9567 testified, the court finds that virtually all of the absentee vote applicants who testified at trial reasonably expected in good faith that they would be unable to vote at the polls on the date of the primary.
A third reason for upholding the absentee votes is found in the nature of Connecticut's absentee voting laws. Some states have adopted absentee voting laws which require the submission of a physician's certificate to establish a voter's illness or physical disability. In one such state, a court found that one certificate which stated that the voter suffered from physical senility and had difficulty moving around and a second certificate which stated that the voter had glaucoma with poor vision, were sufficient to establish that the voters could not go to the polls. Application of Moore, 57 N.J. Super. 244,154 A.2d 631 (1959). The legislature in this state has chosen not to require a physician's certificate to establish eligibility for absentee voting. As a result of that choice, it is the voter who subjectively determines in the first instance whether he or she is "unable" to go to the polls. Relying on Application of Moore, Connecticut voters who have difficulty moving or poor vision are eligible for absentee voting.
The plaintiff's second claim with respect to the absentee ballots is that the distribution of absentee ballots at the Towers and 49 Union Avenue constitutes a violation of Conn. Gen. Stat. 9-364 by influencing or attempting to influence voters to stay away from the election. The plaintiff concedes that there is no statutory prohibition which directly prohibits the distribution, completion and filing of applications for absentee ballots in the manner in which it was done here. Conn. Gen. Stat. 9-140 requires only that the applicant sign the absentee ballot application under the penalties of false statement. That was done for each application at issue here. Nor does plaintiff claim that the campaign workers verbally told voters not to go to the polls. Plaintiff claims instead that the effort to facilitate the use of absentee ballots in the manner in which it was done here constitutes an attempt to influence electors to stay away from the election. This claim fails on the facts and as a matter of law.
The evidence at trial showed that most of the voters who voted by absentee ballot in the primary had voted by absentee ballot at least once previously because of illness or physical disability. Many of them had voted absentee for several years. CT Page 9568 Even before they were approached by campaign workers with the absentee ballot applications, most of these voters were already inclined to vote by absentee ballot. There was no evidence that the distribution of absentee ballot applications was done with the intention of keeping these voters away from the polls. Instead, the evidence showed that those who assisted the voters with the absentee ballot applications were motivated by the desire to encourage people to vote. In fact, several tenants of the Towers and 49 Union Avenue testified that they voted at the polls on primary day despite having obtained absentee ballots because they felt well enough to vote at the polls that day. The plaintiff has conceded that she must prove her allegations of election law violations by clear and convincing evidence, a higher burden of proof than the customary fair preponderance of the evidence. Wilks v. Mouton, 229 Cal.Rptr. 1, 3 (1986). based on the evidence presented, the court cannot find that there is clear and convincing evidence that one or more of the defendants influenced or attempted to influence voters to stay away from the election.
The court also questions whether a violation of Conn. Gen. Stat. 9-364 can be established with evidence of a campaign to provide absentee voter applications and assistance to voters who believe they qualify to vote by absentee ballot. As plaintiff has conceded, the process used does not violate the statutory provisions which set forth in great detail the procedures for applying for and voting by absentee ballot. Plaintiff has offered no precedent for her claim. The court is not persuaded that the legislature intended that the absentee vote application process used here should be found in violation of the general provision of Conn. Gen. Stat. 9-364 despite the legislature's failure to adopt statutory provisions specifically prohibiting this type of conduct. In 1987, the legislature considered but rejected a proposal which would have prevented campaign workers from distributing absentee ballot applications. Although concerned about the possible abuses of the absentee ballot process, members of the legislature were also very concerned that the right to vote by absentee ballot not be unduly restricted. See transcript of public hearing of Government Administration and Elections Committee, February 9, 1987. The court cannot find any basis for holding that the distribution of absentee ballot applications is a violation of Conn. Gen. Stat. 9-364.
The plaintiff also argues that the absentee ballot application process used here violated Conn. Gen. Stat. 9-355 in CT Page 9569 that it constitutes a neglect of performance with respect to election and primary laws. This claim, which was not clearly formulated, must be rejected on the same basis as the claim under9-364. The legislature has rejected provisions which would prohibit campaign workers from distributing absentee ballot applications. There is no precedent nor any factual basis for finding a violation of 9-355.
The plaintiff's final claim with respect to the absentee ballots is that Conn. Gen. Stat. 9-159r was violated in that the registrar of voters failed to supervise the absentee ballot voting at the Towers and 49 Union Avenue. Section 9-159r
requires the registrars of voters to supervise absentee ballot voting at any "institution" where twenty or more of the "patients" are electors. "Institution" is to be construed as defined in Conn. Gen. Stat. 9-159q, which provides for supervision of absentee ballot voting on the request of the administrator of an institution where there are less than twenty electors. "Institution" is defined as "a veterans' health care facility, home for the aged, health care facility for the handicapped, nursing home, rest home, mental health facility, alcohol or drug treatment facility or an infirmary operated by an educational institution for the care of its students, faculty and employees." Although no other statute is incorporated into the definition by reference, the plaintiff argues that the Towers and 49 Union Avenue are "homes for the aged" as defined in Conn. Gen. Stat. 19a-490. However, 19a-490 provides that the definition of home for the aged in that section is "[a]s used in this chapter," a chapter of the statutes concerning the licensing and regulation of health care institutions. Even if the definition were applicable to the chapter for election laws, plaintiff has not proven that either the Towers or 49 Union Avenue provides laundry services. Nor is there evidence that the Housing Authority provides any food service at 49 Union Avenue.
Both the Towers and 49 Union Avenue are housing complexes for the elderly and handicapped. Each facility has apartments and/or efficiency units for rental to the elderly and handicapped. Each unit which is rented has its own kitchen and bathroom facilities, although a meal plan is required at one of the two Towers buildings. The units are designed for independent living and the tenants take care of themselves. Although recreational programs and some social services are available, neither facility offers any medical services to its tenants. Neither of these facilities is an "institution" as defined in CT Page 95709-159q because no medical services are provided. Section 9-159q
emphasizes the medical services by referring to the electors as "patients." In 1987, a proposal was discussed in the legislature for adding public housing complexes to the statute. See public hearing transcript of February 9, 1987, supra, pp. 83, 85. However, that proposal was not adopted and the supervised voting requirement as enacted is intended to apply to "institutions such as nursing homes." Proceedings in the House of Representatives, June 1, 1987, p. 430. The claim that 9-159r applies to the Towers and 49 Union Avenue is without merit.
The plaintiff's remaining claims arise out of alleged statutory violations apart from the absentee voting. The first of the claims is that the town clerk failed to publish notice of the location of the polling place for the sixth ward, which is part of the 95th District. Conn. Gen. Stat. 9-435 requires the town clerk to publish notice of the primary, including the location of the polls, in a newspaper with general circulation in the town. On August 21, 1992, the New Haven town clerk published notice of the primary in the legal advertisements of the New Haven Register. The polling place for the sixth ward was shown as Mildin School. After the notice was published, however, the Democratic and Republican registrars decided to change the polling place to West Hills Middle School. The Democratic registrar did not give notice of the change to the town clerk so no corrected notice was published.
To ensure that sixth ward voters had notice of the polling place, the Democratic registrar sent individual notices by mail to each household in the sixth ward. The notice, which was sent approximately one week before the primary, advised sixth ward voters of the location of their polling place and the date and hours of the primary. In addition to this notice, the New Haven Register carried a story on the primary on September 14, 1992, the day before the primary, and included a list of all of the polling places, including the polling place for ward six. The listing was prominently displayed on the upper half of page 4.
The plaintiff contends that the lack of formal notice of the correct polling place in the sixth ward is a jurisdictional defect analogous to the failure to give notice of a zoning meeting. She has cited no precedent for such a claim. The standard, however, for statutory violations in election cases is that of substantial compliance. Where the legislature has adopted mandatory election requirements, at least substantial CT Page 9571 compliance with the statutes is necessary. Dombkowski v. Messier, 164 Conn. 204, 209 (1972); Wrinn v. Dunleavy, supra at 149.
The court finds that there was substantial compliance with the statutory notice requirement through written notice mailed to the household of all Democratic voters in the sixth ward. In addition, the September 14, 1992 edition of the New Haven Register provided additional notice of the sixth ward polling date. Moreover, the plaintiff did not produce evidence that any sixth ward voter was confused about the correct voting location and failed to vote. There was substantial compliance with the statutory notice requirement.
The plaintiff did prove several violations of applicable election statutes. Most of the violations concern the personnel chosen to officiate at the polls. Because of a shortage of election officials, one of the moderators, who was quite experienced, did not have a current certification from the secretary of the state; several voting districts did not have assistant registrars, with the moderator therefore appointed to act also as assistant registrar; election officials were appointed from outside the 95th District; and there was not equal representation of the competing parties in the selection of absentee ballot counters. In addition, one of the moderators, who was pressed into service because of the shortage, had to leave the polls for approximately two hours for an important meeting. (When he did so, he appointed the official checker to act as moderator in his absence.) The plaintiff failed to show, however, that any of these violations had or might have had any impact whatsoever on the results of the primary. A new primary therefore cannot be ordered based on such violations.
The plaintiff's final claim is that two voters were improperly allowed to vote on paper ballots. In the fourth ward both voting machines were inoperable for approximately fifteen to twenty minutes before they could be repaired. During the time when the machines could not be used, two voters appeared at the polls, wanted very much to vote, but could not wait for the machines to be repaired. The moderator therefore permitted the voters to vote by paper ballot, as authorized by Conn. Gen. Stat.9-263, which requires that emergency paper ballots be "immediately" permitted. The court finds no merit to the plaintiff's claim.
CT Page 9572 In light of the court's findings, it is not necessary to address the defendants' special defenses. Judgment is entered for the defendants.
Vertefeuille, J.