[No. B017453. Second Dist., Div. Three. Oct. 28, 1987.]

MICHAEL ESCALANTE, Plaintiff and Appellant, v.
CITY OF HERMOSA BEACH et al., Defendants, Cross-defendants
and Respondents;
SHEILA DONAHUE MILLER, Cross-complainant and Appellant.

1010

COUNSEL

Manatt, Phelps, Rothenberg & Phillips, Manatt, Phelps, Rothenberg, Tunney & Phillips, Robert E. Hinerfeld, Paul J. Hall, John T. Thornton and Kristine Blackwood for Plaintiff and Appellant.

Sheila Donahue Miller, in pro. per., for Cross-complainant and Appellant.

James P. Lough, City Attorney, for Defendants and Respondents.

OPINION

DANIELSON, Acting P. J.—This appeal and cross-appeal are taken from a judgment of the superior court and a portion thereof, respectively, in an election contest.

### FACTS AND PROCEDURAL HISTORY

In a special election held on June 11, 1985, the voters of the City of Hermosa Beach (the City) considered an initiative measure essentially authorizing the City to enter into an agreement for the development of certain City-owned property. Following the election, the city clerk's canvas resulted in defeat of the measure, 2,397 voters having voted "yes," and 2,398 having voted "no." Supporters of the measure requested a recount, which again resulted in defeat of the initiative, by a tally of 2,398 "yes" votes and 2,400 "no" votes.

Plaintiff and cross-appellant Michael Escalante filed a Statement of Contest of Election (Elec. Code, § 20050),[1] alleging that illegal votes were cast (§ 20021, subd. (d)), and that the city clerk and the recount board, in conducting the recount, made errors sufficient to change the result of the election (§ 20021, subd. (e)).

Appellant Sheila Donahue Miller and the Hotel Referendum Committee[2] filed a cross-statement of contest of election on the same grounds, claiming the inititative measure was in fact defeated by a larger majority than that found on recount.

Following trial, the court determined (1) the city clerk erroneously failed to count two "yes" votes of absentee voters who marked their punch card ballots with a pen on the chad designated "yes," rather than punching out

[1] Unless otherwise indicated, all statutory references are to the Elections Code.

[2] The committee's title was apparently derived from prior activity in connection with a referendum measure concerning the same City-owned property. The trial court found the committee was not a natural person or an elector, and therefore lacked standing to challenge the election results. This finding is not challenged on this appeal, to which the committee is not a party.

the chad as directed,[3] (2) the clerk properly counted as a "no" vote a ballot punched "no" with transparent adhesive tape on the reverse side holding the "yes" chad in place, (3) five ballots punched "no" that also had other chads punched out were properly counted as "no" votes, (4) one ballot punched "yes" with an additional chad punched so that it remained attached to the ballot by only one of its four arms was also properly counted, (5) two ballots with neither the "yes" or "no" chads punched out, but with nearby chads punched, were properly not counted, (6) the clerk erred in counting an absentee ballot marked "no" by voter Margaret Davey but returned to the clerk's office by one Peter Barks, (7) the clerk properly counted the ballot of Anthony C. De Bellis, Jr., who moved from one precinct to another more than 29 days prior to the election, and mailed his new address to the Registrar of Voters well in advance of the election, but was not placed on the voting records of his new precinct until he again notified the registrar following the election, and who voted in his former precinct, and (8) the clerk acted within her discretion in refusing to count the absentee ballot of Jane R. Woods upon determining that there was a discrepancy between Woods's signature on the ballot envelope and her signature on the affidavit of voter registration, although Woods testified she did in fact sign both of these documents. The court noted that Woods also put an address of a place other than her residence on the absentee ballot envelope.

Judgment was entered accordingly, resulting in a count of 2,400 votes in favor of the ballot measure, and 2,399 against the measure, which then carried.

Each of the trial court's determinations is challenged by one or another of the parties to this appeal. Following some preliminary observations, we will consider them in the order set forth above.

### DISCUSSION

■ "The scope of review in an election contest is not different from other cases. Where the evidence is in conflict, this court will defer to the trial court where events at trial and demeanor of the witnesses play an important part in the decision. However, the interpretation of ballots is governed by the same rules applied to the construction of all other written instruments unless the interpretation turns on the credibility of extrinsic evidence. Accordingly, this court is not bound by an interpretation given a ballot based solely on the ballot without the aid of evidence, where there is

---

[3] "Chad" is defined in Webster's New Collegiate Dictionary as: "small pieces of paper or cardboard produced in punching paper tape or data cards; also: a piece of chad." (Webster's New Collegiate Dict. (8th ed. 1979) p. 181.)

no conflict in the evidence, or an interpretation has been made upon incompetent evidence." (*Fair* v. *Hernandez* (1981) 116 Cal.App.3d 868, 874 [172 Cal.Rptr. 379], citing *Keane* v. *Smith* (1971) 4 Cal.3d 932, 939 [95 Cal.Rptr. 197, 485 P.2d 261].)[4]

■ *The Trial Court Properly Ruled Valid Absentee Ballots Marked With Pen, Rather Than Punched*

Section 10339 provides: "If punchcard ballots are used for absent voting, the ballots shall be marked by pencil, or by a marking device which enables the voter to register his vote by punching or slotting the ballot card. Counting of punchcard ballots marked by pencil may be as with paper ballots, or a true duplicate copy of each ballot may be prepared using the same procedure as provided by Section 15271. Absent voter ballots so counted by the counting device." With respect to the two ballots (exhibits 1 and 2) upon which absentee voters marked their "yes" votes with a pen, rather than punching out the chad as directed in the voting instructions,[5] the trial court found there was "no relevant difference" between the pen markings made by the voters and the pencil markings permitted under section 10339.

Miller points to section 11, which provides that "shall" is mandatory and "may" is permissive. Escalante and the City point out that section 10339 appears in article 3, entitled "PUNCHCARDS", of chapter 3, entitled "VOTING MACHINES AND VOTE TABULATING DEVICES", of division 8, entitled "BALLOTS", of the Elections Code. "PUNCHCARD" is defined in section 10332 as "a tabulating card on which the voter may record his vote by punching, marking, or slotting, *and the word 'punching' includes marking a ballot card to record a vote.*" (Italics added.)

Chapter 2 of division 8, entitled "FORMS OF BALLOTS", contains section 10204 on instructions to voters, which requires that ballots contain the printed instruction: "On absent voters ballots mark a cross (+) with pen or pencil." Section 10226, also on voting instructions, also requires the printed instruction: "(ABSENTEE BALLOTS MAY BE MARKED WITH PEN AND INK

---

[4]Pursuant to rule 12(a), California Rules of Court we have augmented the record to include the entire superior court file, including exhibits.

[5]The Absent Voter Instructions provided in connection with the election read, in part: "HOW TO VOTE YOUR BALLOT

"1. Record your vote by removing completely the cross (+) to the right of your choice. Use the following method:

"A. Put card on table top.

"B. With point of pen or pencil, press down on the cross to the right of your choice.

"C. While still pressing down on the cross, slowly raise card with other hand until cross is completely detached from card."

OR PENCIL.)" Also pertinent is section 10326, found in article 2 of chapter 3, entitled "VOTE TABULATING DEVICES": "The device for marking the ballot may be of any size, shape or form, and the impression made on the ballot may be in the form of a cross, square, circle, rectangle, or any other design that will clearly indicate the choice of the voter. Any type of ink or other substance that will clearly show the voter's choice may be used in or in conjunction with the marking device. In addition, in the case of absent voter ballots, the voters may be provided with a supply of stickers for indicating their choices."

Miller urges that the sections other than 10339 are general, while section 10339, limiting the voter's choices to pencil or marking device enabling the voter to punch or slot the ballot card, is specific, and therefore controlling. She cites in support of her argument section 10200, appearing at the beginning of chapter 2, which provides: "All ballots used in all elections shall be governed by the provisions of this chapter unless otherwise specifically provided." Miller also urges that the provisions of chapter 2 by their terms apply to paper ballots, rather than the punch card ballots governed by article 3 of chapter 3.

Whether or not resort may be had to the provisions of chapter 2, we believe the trial court properly ruled the challenged ballots valid despite the use of the word "shall" in section 10339 regulating punch card ballots. In citing section 11, Miller ignores section 4: "Unless the provision or the context otherwise requires, these general provisions, rules of construction, and definitions shall govern the construction of this code." In other words: " ' "Shall" is mandatory and "may" is permissive' unless the provisions or the context otherwise requires. (§§ 11, 4; *Garrison* v. *Rourke* (1948) 32 Cal.2d 430, 437 . . . . [Overruled on another point in *Keane* v. *Smith, supra,* 4 Cal.3d 932, 939.])" (*Fair* v. *Hernandez, supra,* 116 Cal.App.3d 868, 876-877.)

Here, the trial court's construction of the direction set forth in section 10339, that punch card ballots be either punched or marked with a pencil, as not precluding marking with a pen, does not abrogate the general scheme regarding punch card voting, or undermine the secrecy, uniformity and fairness of the vote, or the integrity of the voting process. Nor are we persuaded by Miller's argument that the pen markings constitute impermissible identifying marks. "The line of cases which put aside some marks as not showing the necessary intent to identify turned on then extant section 7054, or its predecessor, which provided that no unauthorized mark shall invalidate the ballot unless ' "it shall appear that such mark was placed thereon by the voter for the purpose of identifying such ballot." ' [Citations.] [¶] The just quoted portion of the statute survived the 1961 reenact-

ment in section 17074 (Stats. 1961, ch. 23, p. 808); however, those words are omitted in the 1975 amendments. The Legislature now mandates, '[n]o voter shall place any mark upon a ballot that will make that ballot identifiable.' (§ 14241.) Because the act of voting itself makes the ballot identifiable the intent of the Legislature must have been that votes cast for the same candidate be done in so similar a manner that the ballots properly cast will be indistinguishable one from the other and therefore not be identifiable as having been cast by a particular voter. Furthermore, '[a]ny ballot which . . . is marked . . . by the voter so that it can be identified by others' is not to be counted. (§ 17007.) Although the critical words in section 17007 are different from those in section 17074 and its predecessors, their import is the same and the reasoning in the *Turner* case, requiring intent to identify, remains valid." (*Fair* v. *Hernandez, supra*, 116 Cal.App.3d 868, 877-878, citing *Turner* v. *Wilson* (1915) 171 Cal. 600, 604 [154 P. 2].) There is nothing about the ballots here in question warranting the inference that the voters' use of pens, rather than pencils, to mark the punch cards was done for the purpose of identifying the ballots. The trial court properly counted these two "yes" votes.

### The Taped Ballot Was Properly Counted

Escalante contends the trial court should not have counted the absentee ballot voted "no" with the "yes" chad punched out and taped back in, characterizing the ballot as equivocal, spoiled, and identifiable.

In our view, an equivocal ballot is one from which "the choice of the voter is impossible to determine . . . ." (§ 17007; *People* v. *Campbell* (1902) 138 Cal. 11, 21 [70 P. 918].) Such a ballot is not countable. We have examined the challenged ballot (exhibit 3) and find nothing equivocal about it. On its face, the ballot represents a clear "no" vote; the "yes" chad is neatly secured in its place by a small piece of clear tape affixed to the back of the ballot after mistaken or accidental removal. Escalante's argument that the ballot may have been altered by a person other than the voter is purely speculative; there is nothing in the record to suggest that the ballot was not delivered to the polling place within an absentee ballot envelope bearing the voter's signature and exhibiting no signs of tampering.

Section 14242 provides, in part: "If a voter spoils or defaces a ballot, the voter shall at once return it to the ballot clerk and receive another ballot." In the present case, the "Absent Voter Instructions" accompanying absentee ballots provided: "All distinguishing marks on the ballot card are forbidden and make the ballot void. If you wrongly punch, tear or deface the ballot card, return it to the Election Official and obtain another." We believe the statutory provisions regarding spoiled ballots must be read in

conjunction with the provisions regarding equivocal and identifiable ballots, and are plainly designed to prevent the casting of such ballots. Here, as we have stated, there is nothing equivocal about the subject ballot. Nor, under the reasoning set forth in the previous section, is the ballot identifiable.[6] It was properly counted.

■ *Voted Ballots With Additional Chads Punched Were Properly Counted*

Escalante contends the trial court erred in counting six ballots (Exhs. 5-9, 11) which had been punched on nonvote-signifying chads in addition to a proper voting square. "A vote in a blank space does not invalidate the ballot which will be counted in other particulars. [Citations.] The punching of an unassigned number on a punchcard ballot is not a disqualifying identifiable mark in the absence of a showing of intent to make the ballot identifiable. [Citation.]" (*Fair* v. *Hernandez, supra,* 116 Cal.App.3d 868, 880.) The trial court properly counted the challenged ballots.

■ *The Trial Court Properly Refused To Count Ballots That Were Not Punched In Voting Squares*

Miller contends the trial court erred in refusing to count two ballots (exhibits 10, 12) with chads punched below those directly opposite the word "No," in a shaded area within bold lines also enclosing the "No" chads. On one of these ballots, the chad immediately below the designated chad is punched; on the other, the punched chad is the second below that designated for a "no" vote. There are three chads in the shaded areas.

While we find the ballot design unfortunate, the "Absent Voter Instructions" direct the voter to "[r]ecord your vote by removing completely the cross (+) to the right of your choice." Only two chads bear crosses, one to the right of the word "YES," and the other to the right of the word "No." "Ballots are not to be counted as to offices [or issues] as to which they are equivocal. [Citation.]" (*Fair* v. *Hernandez, supra,* 116 Cal.App.3d 868, 880.) When the voter is required to punch out the cross that corresponds to his choice and he fails to do so, or punches another chad, which in the particular election is not assigned to either a candidate or an issue, he has failed to

---

[6]Escalante urges reconsideration of *Fair* v. *Hernandez* insofar as the court there required an intent to identify, and reinstatement of the principles set forth in decisions predating section 7054 or its predecessor, Political Code section 1211, subdivision (4) (e.g., *People* v. *Campbell* (1902) 138 Cal. 11), in light of the Legislature's omission of the intent requirement in the 1975 amendments. We concur in the reasoning of *Fair* v. *Hernandez* set forth above, and note that the Legislature has not seen fit, since the decision was issued in 1981, to correct any misperception of the court as to its intent.

mark his ballot as required by law and the vote cannot be counted. (*Ibid.; Livingston* v. *Heydon* (1972) 27 Cal.App.3d 672 [104 Cal.Rptr. 83].) These ballots were properly excluded from the trial court's count.

■ *The Court Properly Refused To Count The Davey Ballot*

Citing *Wilks* v. *Mouton* (1986) 42 Cal.3d 400 [229 Cal.Rptr. 1, 722 P.2d 187], Miller urges that the court erred in refusing to count the absentee ballot of Margaret Davey, which was returned to the clerk's office, at Davey's request, by Peter Barks. In *Wilks* v. *Mouton* the court considered former section 1013, which provided in part: "After marking the ballot, the absent voter may return the ballot to the official from whom it came by mail or in person, or may return it to any member of a precinct board at any polling place within the jurisdiction."

The court agreed with the appellants in that case "that section 1013 directs the voter to return the completed ballot personally if he decides not to use the mail, and that the section does not contemplate the voter's use of a third party to deliver the ballot. [Citations.]" (*Id.* at p. 411.) However, the court characterized section 1013 as directory in nature and stated: "[n]oncompliance with directory provisions of the Elections Code will not nullify a vote unless the irregularity prevented ' "the fair expression of popular will" ' [citation] or the 'result of the election has been changed or rights of the voters [were] injuriously affected by the deviation.' [Citation.] The trial court's findings clearly show that neither occurred here. Under these circumstances, where there has been no fraud, tampering or coercion, departure from the technical requirements of the statute will not disenfranchise voters who had no knowledge that they had failed to comply." (*Wilks* v. *Mouton, supra,* 42 Cal.3d at p. 412.)

In the present case, the trial court made no findings comparable to those made by the court in *Wilks* v. *Mouton, supra.*[7] More importantly, the Legislature subsequently clarified its intent that the provisions of section 1013 be given mandatory, rather than directory, effect.

In September 1986, the section was amended to read, in pertinent part: "The absent voter *shall* return the ballot to the official from whom it came by mail or in person, or may return it to any member of a precinct board at any polling place within the jurisdiction." (Stats. 1986, ch. 866, § 2, italics added.) The section was again amended, effective May 18, 1987, to read, in part: "After marking the ballot, the absent voter shall either: (1) return the

---

[7] The court found only that "Davey authorized Barks to return the ballot to the City clerk and Barks did so, timely."

ballot by mail or in person to the official from whom it came or (2) return the ballot in person to any member of a precinct board at any polling place within the jurisdiction. However, an absent voter who, because of illness or other physical disability, is unable to return the ballot, may designate his or her spouse, child, parent, grandparent, grandchild, brother, or sister to return the ballot to the official from whom it came or to the precinct board at any polling place within the jurisdiction." The latter amendment was enacted for the express purposes of clarifying "the potential ambiguity contained in the August 21, 1986, decision of the California Supreme Court in Wilks v. Mouton, 42 Cal.3d 400," and declaring, inter alia, that "[t]he intent of the Legislature is and always has been that the provisions of Section 1013 are mandatory and not directory in effect." (Stats. 1987, ch. 22, § 1.)

 "While it is true that as a general rule statutes are not to be given retroactive effect unless the intent of the Legislature cannot be otherwise satisfied [citation], an exception to the general rule is recognized in a case where the legislative amendment merely clarifies the existing law. [Citations.] The rationale of this exception is that in such an instance, in essence, no retroactive effect is given to the statute because the true meaning of the statute has been always the same. [Citation.]" (*Tyler* v. *State of California* (1982) 134 Cal.App.3d 973, 976-977 [185 Cal.Rptr. 49]; *City of Redlands* v. *Sorensen* (1985) 176 Cal.App.3d 202, 211 [221 Cal.Rptr. 728].)

 The present case falls within the exception described above. In its most recent amendment of section 1013, the Legislature expressly stated that its purpose was to clarify potential ambiguity in *Wilks* v. *Mouton,* and to declare that its intent "is and always has been" that section 1013 be given mandatory effect.[8]

 "The law is well established that although construction of a statute is a judicial function, where a statute is unclear, a subsequent expression of the Legislature bearing upon the intent of the prior statute may be properly considered in determining the effect and meaning of the prior statute. [Citations.]" (*Tyler* v. *State of California, supra,* 134 Cal.App.3d 973, 977.)

 The trial court properly refused to count the Davey ballot.

---

[8]Miller urges that the 1987 amendment does more than clarify the mandatory intent of the statute, in that it also provides for exceptions to the requirement of personal return of absentee ballots which were not present in the prior versions of section 1013. We do not purport to determine whether the latter provision, which is severable from the rest of the section, is to be given retroactive effect.

### The Court Erred In Counting The De Bellis Vote

On April 1, 1985, Anthony De Bellis, Jr., a member of the Hermosa Beach City Council, moved from 713 Loma to 220-29th Street. According to his testimony at trial, which was believed by the trial court, De Bellis thereafter picked up affidavit of registration forms (exhibit 45) for himself and his roommate from a table outside of the City Council chamber and took them home. After completing his form, De Bellis took it to his place of employment in Inglewood and placed it in an "out" basket from which mail is customarily taken to a mail room, where it is picked up by postal workers. His roommate subsequently received the registrar's notification of her registration; De Bellis received no such notice. After seeing the voter's pamphlet for the election at a City Council meeting, De Bellis called the city clerk's office and was assured he would receive a pamphlet with an absentee ballot form on the back. He later called again, and was again assured that his pamphlet would be forwarded. Just prior to the election, De Bellis, who had not received the pamphlet, called the administrative assistant to the city manager who, after apparently conferring with the city clerk's office, advised De Bellis of the voting place where he ultimately cast his ballot, which was the polling place for the precinct in which his former residence was located.[9]

Miller contends the trial court erred in ruling valid the ballot cast by De Bellis, in that he moved from the precinct in which he voted more than 28 days prior to the election.

An "elector" is "any person who is a United States citizen 18 years of age or older and a resident of an election precinct at least 29 days prior to an election." (§ 17.)

"Every person who qualifies under Section 2 of Article II of the Constitution and who complies with the provisions of this code governing the registration of electors may vote at any election held within the territory within which he or she resides and the election is held." (§ 100.)

"A person duly registered as a voter in any precinct in California who removes therefrom within 28 days prior to an election shall, for the purpose of such election, be entitled to vote in the precinct from which the person so removed until the close of the polls on the date of such election." (§ 217.)

A voter who moves from one precinct to another more than 28 days prior to an election must, except in exceptional circumstances (fn. 11, *infra*), vote

---

[9] De Bellis was mistaken in his belief that he could properly cast an absentee ballot without reregistering. (See § 1009, subd. (a).)

in his new precinct after registering his new address by executing a new affidavit of registration (§ 301) or by providing the county clerk with "a notice or letter of the change of address signed by the voter as he is registered" (§ 315) Here, contrary to the assertion of Escalante and the City, De Bellis elected to proceed under section 301, and executed a new affidavit of registration.

"A properly executed registration shall be deemed effective upon receipt of the affidavit by the county clerk or on the 29th day before an election to be held in the registrant's precinct if (a) the affidavit is executed on or before the 29th day prior to the election, and (b) the affidavit is received by the county clerk by mail after the 29th day and by the fourth day after the 29th day before the election." (§ 301.)[10]

Section 504 requires the county clerk, upon receipt of a properly executed affidavit of registration, to send the voter notification by nonforwardable, first-class mail, address correction requested, that, among other things, he is registered to vote and must reregister whenever he moves.

De Bellis was advised of this matter, and more, by the "Voter Information" section of his affidavit of registration form, which read, in part: "2. In order to vote in any specific election you must be registered 29 days prior to that election. (Exception: New California residents may vote for President and Vice President if they register on or before the seventh day prior to a Presidential election.)

"3. You should not consider yourself registered until you receive a Voter Notification Card by return mail. Your registration will become effective upon receipt by the Registrar-Recorder.

"4. If you do not receive a voter notification card, call telephone number (213) 725-5670."

By his testimony, De Bellis knew that he was required to reregister or otherwise apprise election officials of his new address prior to the election.

---

[10]Section 305 provides: "(a) Except as provided in subdivision (b), the county clerk shall accept affidavits of registration at all times except during the 28 days immediately preceding any election, when registration shall cease for that election as to electors residing in the territory within which the election is to be held. Transfers of registration for an election may be made from one precinct to another precinct in the same county at any time when registration is in progress in the precinct to which the elector seeks to transfer.

"(b) The county clerk or his deputy shall accept an affidavit of registration executed as part of a voter registration card in the forthcoming election if (1) the affidavit is executed on or before the 29th day prior to the election, and (2) the affidavit is received by the county clerk or his deputy by mail after the 29th day and by the fourth day after such 29th day."

Assuming, as we must, that he executed a new affidavit well before the election and placed it in his outgoing office mail, the registration did not become effective. (§ 301.) Moreover, De Bellis was on notice, due to the voter information provided him, as well as his failure to receive either a voter notification like that received by his roommate (§ 504) or a voters' pamphlet for the upcoming election, that his reregistration attempt was ineffective, and he failed to take meaningful action to remedy the situation.

Contrary to the trial court's conclusion, there is nothing in the record to suggest that De Bellis's affidavit of registration was "erroneously placed by the county clerk" in his former precinct. (§ 1515.)[11] The affidavit could as well have been lost in the voter's office mail or the Post Office Department. There is no evidence that it ever reached the Post Office Department, or that it was ever delivered to the county clerk. Nor are we persuaded, as was the trial court, that the issue is irrelevant in this Citywide single-issue election. ■■■ " '[T]he right to express one's choice of a candidate at the polls is not unrestricted. It is subject to reasonable regulation in the interest of secrecy and uniformity of the ballot and the fairness of the vote, etc. [Citation omitted.]' [Citation.] . . . The courts have the duty to enforce the statutory scheme for the conduct of elections according to their [sic] terms and evident intention. [Citation.] '[T]he legislative intent underlying a statute must be ascertained from its language; if the language is clear there can be no room for interpretation, and effect must be given to the plain meaning of the language. [Citations omitted.]' [Citation.]" (*Fair* v. *Hernandez, supra,* 116 Cal.App.3d 868, 875-876.)

■■■ Upon moving from one precinct to another more than 28 days prior to the election, De Bellis was required to either reregister (§§ 301, 305, 312) or execute an address change (§ 315) to preserve his eligibility to vote. Having done neither, he was not properly registered to vote in either his old or new precinct. (*Kagan* v. *Kearney* (1978) 85 Cal.App.3d 1010, 1015-1016 [149 Cal.Rptr. 867].) The court erred in counting his "Yes" vote.

### ■■■ The Woods Ballot Was Properly Rejected

The absentee ballot of Jane Woods was rejected by the clerk because the signature on the ballot envelope did not appear to match that on her

---

[11] Section 1515 provides, in part: "If the affidavit of registration of a voter is erroneously placed in a precinct, the voter may apply to the county clerk for a certificate showing the record of registration. The county clerk shall give the voter the certificate on or before election day. Upon presentation of this certificate to the precinct board of the proper precinct, the board shall permit the voter to vote. If the voter does not obtain the certificate provided for in this section and votes in the precinct into which the affidavit of registration has been erroneously placed by the county clerk and the election is contested, the voter's ballot shall not be rejected."

affidavit of registration. In addition, the address appearing in the ballot envelope in the space provided for the absentee voter's residence address differed from the residence address for Woods in the registrar's records. Woods testified at trial that the signature was hers, and that she did reside at the address recorded with the registrar. She offered documentary evidence, in the form of utility bills, supporting her claim of residence, and explained that she had thought she was to place on the absentee ballot envelope the address of the place where she actually completed her ballot.

In the present case, the relevant statutes are sections 1009 and 1015.

Section 1009 provides, in part: "The identification envelope shall contain the following:

"(a) A declaration, under penalty of perjury, stating that the voter resides within the precinct in which he or she is voting and is the person whose name appears on the envelope.

"(b) The signature of the voter.

"(c) The residence address of the voter as shown on the affidavit of registration."

Section 1015 provides, in part: "Upon receipt of the absentee ballot the election official shall compare the signature on the envelope with that appearing on the affidavit of registration and, if they compare, deposit the ballot, still in the identification envelope, in a ballot container in his or her office. A variation of the signature caused by the substitution of initials for the first or middle name, or both, shall not invalidate the ballot. If the ballot is rejected because the signatures do not compare, the envelope shall not be opened and the ballot shall not be counted. The cause of the rejection shall be written on the face of the identification envelope."

As the court stated, in *Wilks* v. *Mouton, supra,* 42 Cal.3d 400, "section 1015 requires only that the elections official compare the signature on the identification envelope with the signature in the affidavit of registration; a comparison of addresses is not required." (*Id.* at p. 413.)

The question before the trial court was not whether the ballot was in fact that of Woods, but rather, whether the clerk abused her discretion in rejecting the ballot based on comparison of the signatures. The trial court examined the voter's signatures as they appeared in the records and on the ballot envelope, and determined that the clerk did not abuse her discretion in

rejecting the ballot. We have examined the evidence, and are also persuaded the rejection was within the clerk's discretion. (Cf. *Wheelright* v. *County of Marin* (1970) 2 Cal.3d 448, 456 [85 Cal.Rptr. 809, 467 P.2d 537].)

## CONCLUSION

Our rejection of the De Bellis "Yes" vote results in a count of 2,399 votes for, and 2,399 votes against, the ballot measure. The contestant, Escalante, has failed to establish precinct board errors, or illegal votes, sufficient to change the election result (§§ 20021, subd. (e), 20024), and the election must be confirmed.

## DECISION

The judgment is reversed. The matter is remanded to the trial court, which is directed to enter a new judgment confirming the election result. Appellant Miller to recover costs on appeal.

Arabian, J., and Baker, J.,* concurred.

A petition for a rehearing was denied November 19, 1987, and the petition of plaintiff and appellant for review by the Supreme Court was denied February 4, 1988.

---

* Assigned by the Chairperson of the Judicial Council.