[Civ. No. 14114. Third Dist. Mar. 5, 1974.]

GEORGE RAYMOND WILLBURN, Plaintiff and Respondent, v.
EUGENE WIXSON, Defendant and Appellant.

**COUNSEL**

David L. Morrow and Stennett M. Sheppard for Defendant and Appellant.

William R. McBay for Plaintiff and Respondent.

**OPINION**

**PIERCE, J.**\*—This appeal involves an election contest arising from the election of a county supervisor in the Fifth Supervisorial District of Trinity

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

County at the general election held on November 7, 1972. There were three candidates, George Raymond Willburn, the plaintiff and respondent (hereinafter referred to as "contestant" or Willburn), Eugene Wixson, defendant and appellant, and a write-in candidate, Hazel Willburn, who is not a party hereto. According to the votes cast and accepted at the election, Wixson won by a plurality of four votes.

It was not urged by contestant Willburn that defendant Wixson committed any wrongdoing or that he was in any way responsible for the acts of which contestant Willburn complained. Epitomized, the offenders were said to be (1) members of the election boards of some of the six precincts of the fifth supervisorial district, because they failed to notify all voters about to vote, to mark ballots showing the candidate of their choice with an "x'd" rubber stamp as required by statute (Elec. Code, §§ 14409, 14412[1]), (2) certain supporters of write-in candidate Hazel Willburn who were accused of having solicited votes for her on election day within 100 feet of polling places in violation of sections 14211 and 14212. None of these violations were shown to have benefited Wixson or to have hurt Willburn—in short, they were not proved to have changed or affected the results of the election in any way.[2] The trial court, nevertheless, held that such acts vitiated the fifth district supervisorial election. We, however, agree with the position of defendant Wixson on appeal that the trial court's conclusion is improper, and we will reverse the judgment.

## FACTS

The following table shows the precinct tallies for the fifth district supervisorial election:

|  | Contestant | Defendant | Hazel Willburn | Rejected Votes |
|---|---|---|---|---|
| South Hayfork No. 1 | 44 | 40 | 18 | (2) |
| South Hayfork No. 2 | 41 | 41 | 13 | 0 |
| Wildwood | 24 | 22 | 25 | 1 |
| Mad River | 38 | 38 | 41 | 3 |
| Ruth | 39 | 32 | 23 | 3 |
| Zenia-Caution | 26 | 38 | 1 | 0 |
| Absentee | 14 | 19 | 29 | 0 |
|  | 226 | 230 | 150 | 9 |

[1]All section references are to the Elections Code.

[2]Hazel and George Willburn are related by marriage. We deem contestant's argued theory that this relationship would somehow draw write-in votes to Hazel and away from George to be sheer conjecture.

The rejected two votes in South Hayfork No. 1 are in parentheses because this was a subject of dispute. The county clerk testified that the tally sheet for this precinct did not show any ballots as having been rejected. A precinct worker at South Hayfork No. 1 testified that two ballots were rejected because they were marked in pencil. The credibility of that testimony is questionable. The record shows that all ballots, those counted as well as those rejected, are dispatched to the county clerk by the election board along with the tally sheets. (Rejected ballots are contained in "envelope No. 6.") In this case not a single ballot was introduced into evidence. The trial court, however, found that a total of nine ballots was rejected because marked with pencil.

The record showed that some, but not all, of the voters to whom ballots were delivered were informed by a member of the election board that the ballot must be marked with the rubber stamp or the ballot would not be counted. Particularly, it appeared that young and inexperienced voters were so advised. Written instructions conveying that information were posted in the voting booths and were printed on the ballots. It was shown that this omission to caution voters orally regarding use of the rubber stamp occurred sometimes in three, and perhaps four, precincts. There was no evidence regarding the practice in Wildwood or Zenia-Caution precincts.

In his petition, contestant did not include improper electioneering and solicitation of votes as a specific ground of contest. The issue appears to have been joined, however, by stipulation. A reading of the record as a whole shows that some doubtful campaigning by the friends and relatives of the write-in candidate, Hazel Willburn, may possibly have occurred. There was none by defendant Eugene Wixson. (A vehicle with a George Willburn sign was located within 100 feet of one polling place for a short period of time during the voting.) Generally speaking, the problem appears to have been that no one, including the county clerk, was able to define how the distance of 100 feet should be measured, e.g., polling places were located in schools, a church and in a building or buildings on the county fairgrounds. The county clerk sought the advice of the district attorney. When he was unavailable, the advice of another attorney was solicited. Eventually, election boards were notified, and they in turn instructed workers for Hazel that distances should be measured from the corner boundary line of the property containing (and nearest to) the polls. Although that definition might cause a variation of several hundred feet with reference to the actual room in which the voting booths were placed and the election boards stationed, it appears there was at least an attempt at compliance with the clerk's fiat. In other instances, Hazel Willburn workers adopted their own points of reference. No wilful violation of the 100-foot restriction has been directed to our attention.

The workers for the write-in candidate were equipped with short pencils bearing the name of Hazel Willburn. These they sought to hand to people who appeared to be about to vote, soliciting them to vote for Hazel. It was not shown that in any specific case such solicited voter actually used such pencil, either to write in Hazel Willburn's name or to mark an "x" thereafter (or elsewhere) on his or her ballot. Nor was it explicitly shown where, with reference to distance from the polls, such pencil solicitations occurred. One of contestant's witnesses testified to the use of a pencil for the purpose of voting. This witness stated her vote was cast for contestant. Since no ballots were produced in evidence, it cannot be determined whether this ballot was counted or rejected. (It is to be noted, however, that the county clerk's table shows that three votes in that precinct were rejected.)

## THE LAW

### 1. *Statutory Law*

The foregoing facts make relevant the following code sections: Section 14409: "In order to prevent voters from marking their ballots with a pencil, except for write-in votes, or otherwise contrary to law, whenever an election officer delivers a ballot to any voter he shall then distinctly state to the voter, so that he may be heard by the bystanders, that the voter shall mark the ballot with the stamp provided by law or the ballot will not be counted except that he may write in his choice of candidate for any office he desires."[3]

Also in point by virtue of the stipulated additions to the issues pleaded are the following: Sections 14211 and 14212 provide, respectively: "No person, within 100 feet of a polling place, shall solicit a vote or speak to a voter on the subject of marking his ballot."

"No person, including an election officer, shall do any electioneering on election day within 100 feet of any polling place."

But also in point and applicable to all of the code sections quoted above are the following statutory limitations upon sections 14409, 14412, 14211 and 14212. First, the limitation in section 20022 which provides: "No

---

[3]That section may be said to be complemented by section 14412, which reads as follows: "The voter, in voting, shall stamp a cross (+) in the voting square after the name of every candidate for whom he intends to vote, and this shall be counted as a vote for each person after whose name the voter has stamped the cross. He may vote for a candidate or person whose name is not printed on the ballot by writing a name for that office in the blank space left for that purpose, in which case his vote for that office shall be counted for the person whose name is so written."

irregularity or improper conduct in the proceedings of the precinct board members, or any of them, is such malconduct as avoids an election, unless the irregularity or improper conduct is such as to procure the defendant to be declared either elected or one of those receiving an equal and highest number of votes where no one person has received the highest number of votes.

And section 20021 which provides, in pertinent part as follows: "Any elector of a county, city or of any political subdivision of either may contest any election held therein, for any of the following causes:

"(a) That the precinct board or any member thereof was guilty of malconduct.

". . . . . . . . . . . . . . .

"(e) That the precinct board in conducting the election or in canvassing the returns, made errors sufficient to change the result of the election as to any person who has been declared elected."

Sections 14409 and 14412 are ambiguous. Do they mean that one voting for a write-in candidate must switch to a rubber stamp to mark the x after having written in the name with a pencil, or may he then mark the x with a pencil, or need he, having written in the name, follow it by an x at all? See—to add to the puzzlement—*Muir* v. *Steinberg* (1961) 197 Cal.App.2d 264, 271 [17 Cal.Rptr. 431].)

Turning to sections 14211 and 14412, they, too, are ambiguous. What is the proper point among several which seem logical from which "100 feet from a polling place" must be measured? The results of this litigation do not depend upon an accurate interpretation of the Legislature's ambiguities. We do not reach those questions.

As this court reads section 20022, it was not proven that any "malconduct," "irregularity," or "improper conduct" of any of the precinct board members procured defendant to be elected, and as we read section 20021, there is no proof that any member of any election board in the fifth district of Trinity County *was proven to be guilty* of "malconduct." That word is defined in Webster's Third New International Dictionary, Unabridged, to mean: "bad conduct; *esp*: dishonesty in managing public affairs . . . ." We have noted that so far as the evidence shows every voting booth and every ballot contained the admonition to voters to use the rubber stamp provided therefor in voting. The election boards were lax in not giving the verbal warning prescribed by section 14409 to every voter. But their omissions did not extend to "malconduct." And, even

were we to assume (contrary to our holding) that laxness here by the election board members equates with malconduct, we point out that such "malconduct" will not annul the election "unless the rejection of the vote of that precinct would change the result as to that office in the remaining vote of the county." (§ 20023.) Here, were we to throw out the vote in all of the precincts where there is evidence of what contestant calls "malconduct" (South Hayfork No. 1, South Hayfork No. 2, Mad River and Ruth), defendant Wixson still received enough unchallenged votes (in Wildwood and Zenia-Caution precincts—also absentee votes) to win the supervisorial race.

Secondly, there is not, as contestant claims, evidence to support an inference that either the precinct board or Hazel Willburn's workers made errors sufficient to change the result as to "any person who has been declared elected." There is no evidence whatever that the counting of any vote for Hazel Willburn took a vote away from George. Witness Vance testified that witness Lasca Claire Denny was her mother, that Hazel Willburn was her grandmother, and that Hazel was married to James Perry Willburn. James had a brother named Ray who was contestant George Willburn's father. Thus George was Hazel's nephew by marriage. No consanguine relationship appears. We find not a word in the record to indicate whether the family relationships were close or distant, friendly or unfriendly. Nothing in the record indicates that there was any greater likelihood that, had Hazel not been in the supervisorial race, her votes would have gone to George than that they would have been cast for defendant Wixson. To fashion an election contest upon suppositions that this marital relationship ipso facto made George Willburn a second choice would not be to do justice. On the contrary, it would be to disenfranchise the 230 voters who properly voted for defendant. That, this court will not do.

## 2. Case Law

A series of cases are reviewed in *Rideout* v. *City of Los Angeles* (1921) 185 Cal. 426, 430 [197 P. 74]. Therein the court states: "It is a primary principle of law as applied to election contests that it is the duty of the court to validate the election if possible. That is to say, the election must be held valid unless plainly illegal. [Citations.]" (See also *Hayes* v. *Kirkwood* (1902) 136 Cal. 396 [69 P. 30] (irregularities result of ignorance or inadvertence; election upheld where no harm done).) Pursuant to this principle even a mandatory statute must be liberally construed. (*Kenworthy* v. *Mast* (1903) 141 Cal. 268, 271 [74 P. 841].) The Legislature intended that some margin be allowed in interpreting the election laws. (*Packwood* v. *Brownell* (1898) 121 Cal. 478, 480 [53 P. 1079].) The court in *Ken-*

*worthy* also noted at page 271: "It was said by this court in *Atkinson* v. *Lorbeer,* 111 Cal. 419, 421 [44 P. 162]: 'Of course, neither the voters nor those voted for have any control over election officers, and to set aside the vote of a precinct, when there was clearly no fraud or any mistake affecting the result, for mere irregularities occasioned by the ignorance or carelessness of election boards would, in many cases, be a patent injustice. Moreover, a construction requiring an exceedingly strict compliance with all statutory provisions might tempt to irregularities contrived for the very purpose of vitiating the vote at a certain polling-place, and as was said in *Whipley* v. *McKune,* 12 Cal. 361, "might lead to more fraud than it would prevent." ' "

Defendant properly points out that the burden was on contestant to prove unfairness. (See *Rideout* v. *City of Los Angeles, supra,* 185 Cal. at pp. 432-433; see also, *Coghlan* v. *Alpers* (1903) 140 Cal. 648, 653 [74 P. 145].) As we have stated above, he has failed. The record is devoid of any proof as to "how" or "why" the contestant would have won the election.

This court recognizes the limitations placed upon appellate courts by the "substantial evidence" rule in regard to overruling a trial court's determination on questions of fact. That rule, however, applies only when the trial court has acted upon "substantial" evidence. To be substantial, evidence must be ponderable, i.e., "credible and of solid value." (*Lane & Pyron, Inc.* v. *Gibbs* (1968) 266 Cal.App.2d 61, 68 [71 Cal.Rptr. 817].) Although we are well aware of the substantial evidence rule, we also note that in an election contest the evidence must be "very clear" (*Smith* v. *Thomas* (1898) 121 Cal. 533, 536 [54 P. 71]), "clear and convincing" (*Hawkins* v. *Sanguinetti* (1950) 98 Cal.App.2d 278, 283 [220 P.2d 58]).

Here, as we have stated above, all that the evidence shows is speculation and conjecture where such speculation and conjecture could just as logically lead one way as the other. The irregularities we have discussed *might* just as readily have deleteriously affected defendant Wixson as contestant Willburn; or, they might have hurt neither. And we emphasize that we do not acknowledge that proof by substantial evidence was necessarily beyond the power of contestant. Every ballot cast in the election was, according to the county clerk, available for production into evidence— those accepted as well as those rejected. Such ballots, had they been produced, may or may not have been decisive. Contestant did not elect to produce them.

In *Law* v. *San Francisco* (1904) 144 Cal. 384, 394 [77 P. 1014], the court states: "Universally courts have been reluctant to defeat the fair

expression of the popular will in elections, unless the plain mandate of the law permitted of no alternative."

Here, no statutory mandate requires the courts, as a consequence of the irregularities and improper conduct shown, to cancel this election. On the contrary, as we read section 20022, its statutory *sine qua non* (that an irregularities or improper conduct to avoid an election must be "such as to procure the defendant to be . . . elected . . .") was not proven.

We conclude our discussion by answering a final argument of contestant. He argues a difference between errors "sufficient to *change* the result" (italics added) as stated in subdivision (e) of section 20021, also in section 20023, and misconduct which "*affected* the result." The latter word is used in *Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, e.g., at pages 127, 133 [89 Cal.Rptr. 601, 474 P.2d 417]. Nothing in the context of *Canales* indicates that our Supreme Court intended by use of the word "affected" any meaning different from that implied in the statutory word "change," nor any meaning which, under the facts in the case at bench, would bring any comfort to contestant.

We hold that the facts proven were insufficient to justify the trial court's findings or judgment. Judgment is reversed, and the trial court is directed to cause judgment to be entered declaring defendant Wixson duly elected.

Richardson, P. J., and Janes, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 1, 1974.