Filed 4/25/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| WEBSTER LINCOLN,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>ANTONIO LOPEZ et al.,<br><br>Defendants and Respondents. | A162529<br><br>(San Mateo County<br>Super. Ct. No. 20-CIV-05468) |

Appellant Webster Lincoln ran for City Council of East Palo Alto in the November 2020 election. The election was to fill three seats; Lincoln came in fourth. Lincoln filed a Statement of Contest against respondent Antonio Lopez, who finished third, and Walfred Solorzano, the City Clerk. The trial court heard the contest, where 11 witnesses testified and numerous exhibits were introduced. The trial court then entered a comprehensive 23-page statement of decision rejecting Lincoln's claims, and entered judgment for defendants.

Lincoln appeals, asserting five arguments, the first three of which are substantive arguments identical to those rejected by the trial court. The last two arguments are procedural in nature, asserting that Lopez's answer was late and that the trial court applied the wrong burden of proof. We conclude that none of Lincoln's arguments has merit, and we affirm the judgment.

1

## BACKGROUND

The November 2020 election included three seats on the five-member East Palo Alto City Council.  Seven candidates ran, and Lopez came in third, with Lincoln fourth.  On December 3, the results of the election were certified by the County of San Mateo.

On December 7, represented by counsel, Lincoln filed a 14-page statement of contest, naming as defendants Lopez and Solorzano.  The contest was based on section 16100, subdivision (c) of the Elections Code,[1] and alleged that Lopez violated two sections of the Code:  (1) section 18370, " electioneering within 100 feet of a polling place"; and (2) section 18522, "by offering valuable consideration to voters voting for Lopez."  The statement of contest did not mention section 18502, a claim that was added at the hearing.

On December 22, represented by County Counsel, Solorzano filed his answer to the contest.

On January 7, 2021, Lopez filed his answer.

Trial on the contest was held in February.  Eleven witnesses testified, including Lincoln and Lopez; two San Mateo County Officials (Martin McTaggart and Herbert Masters); several current and former City Council members; Michelle Daher, a person present at the polling site to conduct COVID-19 testing; Gale Wilkerson, a Lincoln supporter; and Gabriel Sanchez, the owner of a taco truck.

Both sides provided proposed statements of decision, and on March 10, the court issued its proposed statement of decision.  Lincoln filed objections, and on March 24, the court filed its statement of decision.  The statement was comprehensive indeed, and began with this description of the issues:

---

[1] All further statutory references are to the Elections Code.

"Lincoln contends that, on Election Day on November 3, 2020, Lopez violated: (1) section 18370 by campaigning within 100 feet of a vote by mail ballot drop box at St. Francis of Assisi Church (St. Francis), a vote center; (2) section 18522 by giving away free tacos at St. Francis; and (3) section 18502 by allowing the taco truck to block a handicap parking space in the St. Francis parking lot." From there, the trial court went on with seven pages of "Findings of Fact" and 14 pages of "Conclusions of Law." Included within the conclusions was an exhaustive exposition of the applicable law, the standards governing election challenges, and the rules of statutory construction, following which the court went on to reject one by one Lincoln's claims. The court then concluded as follows: "Based on the foregoing, the Court finds that Lincoln did not prove by clear and convincing evidence or a preponderance of the evidence that Lopez committed an offense against the elective franchise in violation of section 16100, subdivision (c). Accordingly, the Court denies Lincoln's Statement of Contest and declines to annul the City Council election or order any other relief sought by Lincoln. Judgment shall therefore be entered for Lopez and Solorzano."

On April 21, judgment was entered, from which Lincoln filed his appeal.

## DISCUSSION

### Introduction

Lincoln has filed a 59-page opening brief that has five arguments, the first three of which attack the trial court's rulings rejecting his three claims of contest. They are that: (1) Lopez interfered with the election by illegally electioneering; (2) Lopez violated the prohibition against offering consideration for voting; and (3) violation of the Americans with Disabilities Act interfered with the election by blocking handicapped parking spaces. The

3

other arguments assert (4) that Lopez's answer was not timely and (5) that the burden of proof is by a preponderance of the evidence.

As noted, we reject the arguments, but before discussing why, we begin with a few observations about Lincoln's briefing.

Lincoln's opening brief has a 12-page section entitled "The Evidence Presented at Trial." Some of the claimed evidence is set forth without record reference, in violation of the settled Rules of Court. But beyond that, much evidence is set forth in a way slanted towards Lincoln, illustrated, for example, by reference to witness Daher who, the brief asserts, testified "contrary to later testimony." Indeed, Lincoln goes on to quote Daher's testimony that, apparently referring to the handicap parking issue, indicated the setting "reflected the general neglect of the handicapped."

Lincoln's brief also refers to evidence never mentioned by the trial court, referring to testimony of former city councilperson Sharifa Wilson that she did not like the electioneering at the church site, testimony Lincoln acknowledges that "the court excluded." Finally, the brief cites at length the testimony of Gale Wilkerson, described as "the only handicapped person to testify at trial," and later criticizing the court for not mentioning the testimony. This, of course, had nothing to do with the trial court's decision.

While Lincoln's brief does set forth some of the facts the trial court did decide adversely to him, the brief throughout refers to other evidence, as though this is of some significance. It is not, for several reasons, beginning with the fundamental appellate principle that all evidence must be viewed most favorably to Lopez and in support of the decision. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358 ["Where statement of decision sets forth the factual

4

and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision"].)[2] Put otherwise, Lincoln's attempt to point to other evidence is misguided, as we must affirm even if there is substantial contrary evidence. (See *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.) As the court put it in *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245, "We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party."

In short, Lincoln's argument is based on a version of the record that is contrary to all principles of appellate review—not to mention that it fails to address the significance of the trial court's conclusions as to his two primary claims, the two alleged in his statement of contest, as to which the trial court concluded that Lincoln failed to meet his burden of proof. In light of this, Lincoln has a heavy, perhaps insurmountable, burden on appeal, as set forth, for example, in *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 (*Sonic*): " 'Thus, where the issue on appeal

---

[2] Two fundamental corollaries to this principle are the "conflicting evidence" rule and the "conflicting inferences" rule, both of which require that we view the record in the light most favorable to Lopez and resolve all evidentiary conflicts and indulge all reasonable inferences in support of the decision. (*Leung v. Verdugo Hills Hosp.* (2012) 55 Cal.4th 291, 308; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) More specifically, under the "conflicting evidence" rule, we resolve all evidentiary conflicts in favor of Lopez and affirm so long as the evidence favoring him is sufficient to support the judgment. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479.) Similarly, under the rule of conflicting inferences, we must indulge all reasonable inferences in favor of Lopez. (*County of Kern v. Jadwin* (2011) 197 Cal.App.4th 65, 72–73.)

turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528[, overruled on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7].)"  (Accord, *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 967.)[3]

Finally, Lincoln's brief fails to even mention, much less come to grips with, the principles that guide us here, principles that were set forth for several pages by the trial court—principles that have been continuously set forth by our Supreme Court for over 120 years.

---

[3] One recent case described the burden imposed by *Sonic* this way: " ' "[w]here, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor.  That is because unless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found the [party's] evidence lacks sufficient weight and credibility to carry the burden of proof.  [Citations.]  We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." ' [Citation.]  'The appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably to the prevailing party and in support of the judgment.  [Citation.]  ' "All conflicts, therefore, must be resolved in favor of the respondent.' [Citation.]" [Citation.]' [Citation.]" (*Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1067.)

**The Applicable Law**

In 1921 our Supreme Court confirmed a "primary principle of law as applied to election contests"—"that it is the duty of the court to validate the election if possible. That is to say, the election must be held valid unless plainly illegal." (*Rideout v. City of Los Angeles* (1921) 185 Cal. 426, 430; see *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 192; *Gooch v. Hendrix* (1993) 5 Cal.4th 266, 277; *Wilks v. Mouton* (1986) 42 Cal.3d 400, 404 (*Wilks*), superseded by statute on other grounds as stated in *Escalante v. City of Hermosa Beach* (1987) 195 Cal.App.3d 1009, 1019.) As an even earlier case put it, "courts have been reluctant to defeat the fair expression of the popular will in elections, unless the plain mandate of the law permitted of no alternative." (*Law v. City and County of San Francisco* (1904) 144 Cal. 384, 394.)

Applying such principles, many courts have held—not incidentally, in settings where there was an irregularity, a fact Lincoln has not demonstrated here—that "even a mandatory statute must be liberally construed." (*Willburn v. Wixson* (1974) 37 Cal.App.3d 730, 736 (*Willburn*); see also *Wilks*, *supra*, 42 Cal.3d at p. 404 ["Even mandatory provisions must be liberally construed to avoid thwarting the fair expression of popular will"].) This is because the "Legislature intended that some margin be allowed in interpreting election laws" (*Willburn*, at p. 736), which case went on to note that to set aside an election "when there was clearly no fraud or any mistake affecting the result, for mere irregularities occasioned by the ignorance or carelessness of election boards would, in many cases, be a patent injustice." (*Id*., at p. 737, internal quotations and citations omitted; see also *De Jong v. Pasadena Unified School District* (1968) 264 Cal.App.2d 877, 882 ["Errors that are apparently made innocently and not in violation of substantial rights

7

of electors are not grounds for invalidating an election"]; and *Whipley v. McKune* (1859) 12 Cal. 352, 360–361 [In the absence of fraud, "a strictness of requirement which, forms the mere fact of the existence of informalities not shown to be injurious in their results, would suppress the declared will of the people constitutionally expressed, leads to dangerous consequences"].)

Finally, as Lincoln acknowledges, the trial court's findings of fact are reviewed for substantial evidence. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.)

Applying those principles here leads easily to the conclusion that Lincoln's arguments have no merit.

**The Drop Box Claim**

*The Facts*

On election day there were three vote centers in East Palo Alto, one of which was at St. Francis Church. And at the church location was a drop box for voters to return their mail ballots, which drop box, the trial court found, was with its canopy "located outside—and never inside a building."[4] Consistent with previous elections, County elections officials had placed blue tape on the ground to demarcate the area where persons could campaign without violating anti-electioneering laws, which area was within 100 feet of the drop box.

On election day Carlos Romero, another candidate for City Council, arrived at St. Francis around 7:30 a.m. and began campaigning in the area marked by the blue tape; two other people were also campaigning in that area. Lopez arrived around 10:30 a.m., and campaigned in the same area,

---

[4] The drop box at St. Francis was one of six drop boxes in East Palo Alto, and one of 39 drop boxes located throughout San Mateo County.

doing so for approximately an hour before he left for lunch. As Lopez described it, this was his first election, and he conducted himself in a manner similar to the more seasoned politicians, joining several other candidates, including Romero and Julian Garcia, a candidate for the school board.

Campaign volunteers also met up in the area cordoned-off by the blue tape, and Lopez, the other candidates, and the campaign volunteers all stayed within the area demarcated by County election officials during the morning.[5] It was not clear how close Lopez or the other candidates and campaign volunteers got to the drop box, the court finding that, "[B]ased on the testimony and evidence including the location of the drop box pictured in Exhibit 7, it appears that Lopez campaigned no closer than 30 to 50 feet from the drop box."

As noted, Lopez left St. Francis around 11:30 a.m. Then, around noon, County election officials received a complaint about potential electioneering at St. Francis, and field technician Masters was dispatched to address the complaint. County election official McTaggart testified there appeared to be some confusion over whether electioneering could occur within 100 feet of the drop box, and he instructed David Quick to inform Masters that any campaigning must occur more than 100 feet from the drop box. Masters moved the canopy and drop box from their original location to a new location by the far end of a fence. And after the drop box had been moved, the area

---

[5] The court found that: "Staying within that demarcated area at all times, Lopez approached and spoke to persons on the sidewalk likely to vote in person at the St. Francis vote center building and handed out campaign literature. He did not, however, approach any persons going to church services or any voters dropping off their mail ballots at the drop box. While campaigning on election day, Lopez did not shout or use any voice amplification devices."

9

demarcated for campaigning was established in front of the church sanctuary building—more than 100 feet from the drop box. Once Masters moved the drop box, the County deemed the complaint resolved.

### *The Claim*

Lincoln's first argument is that Lopez violated section 3018 by "campaigning within 100 feet of a drop box," in claimed violation of section 18370. As his brief describes it, "Lopez committed an offense against the elective franchise . . . violating Elections Code [section] 18370 by, within 100 feet of a polling place, a satellite location under Elections Code [section] 3018, or an election official's office, or a mail ballot drop box, campaigning, soliciting votes and speaking to voters on the subject of marking their ballots, and by otherwise conducting electioneering as defined in Elections Code [section] 319.5 . . . by displaying ballot measures number, title, subject, or logo, and campaigning for them in violation of the law."

Lincoln is wrong, as his argument is premised on a law that did not apply to the situation here, as the trial court expressly determined. And even if the law applied, any violation was inadvertent.

In November 2020, section 18370 provided that "No person, on election day . . . shall, within 100 feet of a polling place, a satellite location under section 3018, or an elections official's office: . . . (b) [s]olicit a vote or speak to a voter on the subject of marking his or her ballot. . . . (d) [d]o any electioneering as defined by section 319.5."[6] Senate Bill No. 35 amended the

---

[6] Section 319.5 as it read in 2020 provided that " 'Electioneering' means the visible display or audible dissemination of information that advocates for or against any candidate on the ballot within 100 feet of a polling place, a vote center, an elections official's office, or a satellite location under section 3018."

Section 338.5 defines polling place as "a location where a voter casts a ballot and includes the following terms, as applicable: poll, polling location,

10

section in 2021. (Stats. 2021, ch. 318, § 4.) The trial court devoted some five pages in its statement of decision to an analysis of section 18370. Lopez's brief likewise devotes several pages to a discussion of the law. Both discussions are ignored by Lincoln.

Following its analysis, the trial court found that "[S]ection 18370 only prohibits electioneering 'near'—but not within 100 feet of—a drop box." To reach its conclusion, the court started with the relevant statutes, sections 18370 and 319.5, and found the law ambiguous as to the limits on electioneering by drop boxes. The court then turned to interpretive canons, "relevant legislative history and public policy considerations," and concluded that "section 18370 does not prohibit loitering or disseminating electioneering materials within 100 feet of a drop box. It does, however, prohibit loitering or disseminating electioneering materials *near* a drop box."

The court's analysis was essentially in four steps. First, the court noted that section 319.5, subdivision (e) used the term "near," and not a specific distance, and there is a presumption that the Legislature did not intend to apply that 100-feet limitation to drop boxes, going on to note that "a contrary conclusion would render meaningless the word 'near' in [the electioneering] subdivision."

Second, the court reviewed the legislative history and found persuasive the bill analysis of the Assembly Committee on Elections and Redistricting, which corroborated the court's analysis.

Third, the court noted that concerns over the effect of electioneering by a drop box are different from electioneering by a polling place, observing that

and vote center." And it says, vote center means: "a location established for holding elections that offers the services described in sections 2170, 4005, and 4007." (§ 357.5.)

11

"This is far less of a concern at drop boxes because the voter is simply returning a *completed* ballot to the drop box."

Fourth, the court expressed concern that enforcing an absolute prohibition on all campaigning within 100 feet of a drop box would present "serious constitutional questions." The court reasoned that drop boxes may be available for up to 29 days before an election, and placed in areas where large numbers of people congregate. An absolute prohibition measuring 100 feet would raise serious free speech questions.

Describing the wording of the statute as "clumsy," Lincoln purports to rely on a single word in the legislative digest when section 18370 was amended in 2021, which digest reads as follows: "This bill would expand the prohibited activities to include obstructing ingress, egress, and parking, and specify that such activities are prohibited within 100 feet of (1) the entrance to a building that contains a polling place, an elections official's office, or satellite voting location, as defined, and (2) an outdoor site at which a voter may cast or drop off a ballot." (Senate Bill No. 35 (2021–2022 Reg. Sess.) Sep. 27, 2021.)[7]

Ignoring the word "expand," Lincoln argues that the use of the word "specify" means that the Legislature's amendment intended to restate existing law. The legislative history belies the claim: In every bill analysis prepared for both the Assembly and the Senate, the author presents the "existing law" and does not state that existing law prohibited electioneering within 100 feet of an outdoor drop box. (See Sen. Com. on Elections and Constitutional Amendments, Analysis of Sen. Bill No. 35 (2021–2022 Reg.

---

[7] Lopez requested we take judicial notice of the analysis of the Senate Committee on Elections and Constitutional Amendments, Senate Bill No. 35, dated September 8, 2021, and we do.

Sess.), Sept. 8, 2021, p. 4 [stating that the bill "[m]odifies the current distance prohibiting electioneering and other prescribed political activities to within 100 feet from . . . an outdoor voting area where a voter may cast their ballot or drop off a ballot, as specified"].)

Lincoln states, however erroneously, "The case ultimately came down to the fact that the trial court did not believe the 100-foot limit applied to drop off boxes." And "[e]ven if the limit did not apply, the uncontroverted evidence was that Lopez did 'loiter' near the drop box and campaign to people who used it." This is not an accurate description of the record. Simply, the law in 2020 did not impose a 100-feet electioneering prohibition as to outdoor drop boxes.

In any event, the trial court concluded that even if the 100-foot limit applied to drop boxes, there was insufficient evidence that Lopez committed an offense against the elective franchise, that he did not intentionally violate election laws—that any violation was inadvertent.

Among other things, the court noted that Lopez followed all directions given to him by officials, who at no time told him he was in violation. Lopez, a first-time candidate, attempted to model his conduct based on the conduct of veteran politicians in his vicinity whom Lopez reasonably believed were knowledgeable about the relevant rules. He limited his campaigning to designated areas. And he did not amplify his voice. The court also found that Lopez came no closer than 30 feet from the drop box, and only during a one-hour period in the morning; that he stayed within the area demarcated by County election officials at all times; and that after the drop box was moved, for the rest of election day Lopez campaigned only in the newly demarcated area.

13

*Willburn*, *supra*, 37 Cal.App.3d at pp. 732–734, is persuasive. There, "doubtful campaigning" occurred, including that supporters of one candidate "were accused of solicit[ing] votes . . . within 100 feet of polling places." The problem was that "no one, including the county clerk, was able to define how the distance of 100 feet should be measured"; and workers for the county clerk were instructed to measure in a way that might cause a "variation of several hundred feet with reference to the actual room in which the voting booths were placed and the election boards stationed." (*Id.* at p. 733.) The trial court invalidated the election. The appellate court reversed, finding the violations inadvertent, going on to note among other things that "[n]o wil[l]ful violation of the 100-foot restriction has been directed to our attention." (*Ibid*.) Similarly here, Lopez complied at all times with the directions provided by the elections officials, who were themselves "confused" and "uncertain" about the rules.

As the trial court aptly summed up: "Finally, even if Lopez did violate section 18370, it was due to a mistake made by County election officials when they demarcated the area at St. Francis where candidates could campaign without violating anti-electioneering laws. The evidence establishes that the purported mistake was inadvertent, if not understandable, due to the fact that drop boxes had only been in use since 2018. [Citation.] At worse, County officials were careless, and they fixed their purported mistake promptly after learning about it. [Citations.] Because there is no evidence that this purported mistake by County election officials affected the result of the election, annulling the election on this ground would 'be a patent injustice.' (*Wil[l]burn*, *supra*, 37 Cal.App.3d at p. 737; see also *Witten v. Bucher* (W. Va. 2016) 794 S.E.2d 587, 695 [refusing to annul election because poll workers erroneously demarcated the area for campaigning].)

"Accordingly, Lincoln failed to meet his burden of proving that Lopez committed an offense against the elective franchise by violating section 18370."[8]

**The Taco Truck**

*The Facts*

Some one to two weeks before election day, Lopez hired Gabe Sanchez, who owned a taco truck, to provide free tacos "to the community at St. Francis." Then, on October 29, Lopez posted a flyer on his Facebook page advertising the free tacos. The flyer, in both English and Spanish, read as follows: "This is one of the most important elections of our lifetimes. In a time where we have the chance to restore the right to vote for prisoners, where we can increase funding for affordable housing through Measure V, it is imperative that the people of East Palo Alto have their voice heard. That is why the Lopez Campaign, in collaboration with Taqueria La Cazuela, is proud to sponsor a FREE taquiza outside St. Francis Church. Bring your kids, your neighbors, the other tenants down the hall—all those who've yet to vote—and tell them to come hungry for change."

On election day, the taco truck arrived at St. Francis around 4:30 p.m., and Carlota Romero, a church volunteer, told Sanchez to park the truck in one of the handicap parking spaces in the St. Francis parking lot. He did, parking his truck roughly parallel to the sidewalk, blocking only one handicap parking space at the church. As the trial court would later describe

---

[8] While this is not clear, Lincoln seems to argue that the election should be annulled because an election official moved the drop box. Passing over that the decision was not made by Lopez, we note that this issue was not raised in Lincoln's statement of contest or in the trial court. It may not be raised for the first time on appeal.

it, other parking spaces were available, "including spaces on either side of the space occupied by the truck.  [Citations.]  In addition, there were parking spaces available on the side of the church where handicapped visitors typically parked.  [Citation.]  Numerous witnesses testified that handicapped persons had no trouble voting at St. Francis on Election Day.  [Citations.]"

Soon after the taco truck arrived, Lopez posted a picture of himself in front of the taco truck on his Facebook and Instagram accounts, where he wrote:  "The taco truck has arrived!  Come to the polls at St. Francis from 4–8 & get your free tacos."  Daher and Garcia also posted about free tacos on their Facebook accounts, but neither one mentioned Lopez.  In short, none of the posts not—Lopez's, Daher's, or Garcia's—indicated that Lopez was providing the tacos.

### The Claim

Lincoln's second argument contends that the taco truck violated section 18522, which prohibits a person to "contribute" any valuable consideration to or for any voter, or any other person to "induce any voter" to "[v]ote or refrain from voting at an election for any particular person or measure," and "[r]eward any voter for having . . . [v]oted for any particular person or measure."

The trial court held that Lopez did not violate the statute, concluding in pertinent part as follows:

"Here, Lincoln has not met his burden of establishing that Lopez provided free tacos for the purpose of inducing voters to vote for him, rather than for the purpose of creating general goodwill toward him.  At St. Francis, Lopez did nothing to associate himself with the taco truck.  For example, nothing on or near the taco truck suggested any connection to Lopez or, for that matter, any other candidate or ballot measure.  [Citations.]  There were

16

no campaign signs or posters near the truck. [Citations.] Sanchez and his workers provided free tacos to everyone, including children, who asked for one, [citations] and neither Sanchez nor his workers ever mentioned voting, or any candidate or ballot measure. [Citations.]

"Lopez did not campaign near the taco truck. [Citations.] While campaigning at St. Francis, Lopez did not tell anybody that he was providing the tacos and did not even hint at any exchange of tacos for votes. . . .

"Because Lopez did nothing at St. Francis on Election Day to associate himself with the taco truck, the only evidence of Lopez linking himself to the free tacos comes from his Facebook posts before Election Day and his Facebook and Instagram posts on Election Day. But these posts are not sufficient to establish that Lopez intended to induce voters to vote for him, rather than encourage people to vote or create general goodwill. Lopez's pre-Election Day Facebook post simply exhorted people to vote and eat tacos, and did not urge people to vote for him. [Citation.] Meanwhile, Lopez's Facebook and Instagram posts on Election Day were even more innocuous. Those posts simply told people to '[c]ome to the polls at St. Francis' and 'get your free tacos' and did not even state that Lopez was providing the tacos. . . .

"In reaching this conclusion, the Court does not find the tacos to be materially different than the so-called 'trinkets' that candidates often hand out for free to generate goodwill. At most, each taco cost between $2.35 and $2.67. [Citation.] This is comparable to, if not less than, the cost of shirts, sweatshirts, baseball caps, pens, signs, or posters that are often given out for free by a candidate during an election. Moreover, unlike those items—which are usually emblazoned with the candidate's name, logo, or slogan—nothing on the tacos or taco truck connected them to Lopez."

17

As the court observed, to "induce" under section 18522 means that a violator must have the requisite specific intent, i.e., offer the consideration "for the purpose of inducing" the other person to vote for a particular candidate or ballot measure. Here, the provision of tacos did not reward any voter for voting, or voting for any particular person. The tacos were given to the entire community, including people who obviously could not vote, including children. All witnesses testified that Lopez never asked for a vote in exchange for a taco, and that he never asked if any of the recipients of the tacos had voted or were going to vote. Sanchez, the owner of the taco truck, testified he was told to give tacos to anyone who wanted one, and was not instructed to ask if people had voted in order to receive a taco.

In sum, the trial court concluded that "applying the law to the particular facts of this case, the Court concludes that Lincoln has failed to meet his burden of establishing that Lopez violated section 18522."

**The Handicap Parking Space Issue**

Lincoln's third argument is that it was a violation of law to park the taco truck across a handicap parking space. The issue was not raised in his statement of contest, but Lincoln raised it at the hearing. Lopez did not object to it in his proposed statement of decision, and the trial court considered it. And rejected it. Properly so.

As the trial court described it, the issue was whether the taco truck parking in a handicap parking space constitutes an offense against the elective franchise because it violated section 18502 which, as relevant here, prohibits "[a]ny person" from "in any manner interfere[ing] . . . with the voters lawfully exercising their rights of voting at an election, as to prevent the election . . . from being fairly held and lawfully conducted."

18

The facts here did not measure up, just as the court concluded: "Here, there is no evidence that the blocking of a handicap parking space by the taco truck prevented the election from being fairly held or lawfully conducted. There were at least three other handicap parking spaces available, including spaces on both sides of the space occupied by the truck. [Citation.] Neither the County nor the City received any complaints about the accessibility of the vote center or drop box. [Citations.] Numerous witnesses testified that no handicapped voter appeared to have any problems voting at St. Francis on Election Day. [Citations.] Indeed, Daher testified that most handicapped visitors at St. Francis parked on the street, rather than in one of the handicap parking spaces. [Citation.] In any event, Lincoln cites no authority suggesting that the three available handicap spaces were insufficient to satisfy any accessibility requirement for the voting center or drop box. Indeed, the California Code of Regulations only requires 'one van-accessible parking space designated by the International Symbol of Accessibility' in the parking lot of a location where a drop box is located. (2 Cal. Code Regs., § 20134(b)(2).) Thus, Lincoln has failed to meet his burden of establishing a violation of section 18502."

**Lincoln's Remaining Claims**

We turn briefly to Lincoln's last two arguments, numbered V and VI. Argument V contends that Lopez's "answer was not timely," and, so the argument apparently runs, should have been stricken. Lincoln cites nothing in support of the argument, which is perhaps not surprising in light of the trial court's holding here that distilled the issue—and its resolution—this way:

"Lincoln asked the Court to 'determine whether the answer is timely and whether it must be verified,' and the Court construes this as a request to

19

strike the answer. Because an answer to an election contest need not be verified and because Lincoln has suffered no prejudice from the late answer, the Court declines to do so. [¶] Unlike Lincoln's Statement—which must be verified under section 16401—section 16443 does not require that the answer be verified. Although Lopez did not file his answer 'within five days' after receiving the Statement of Contest as provided by section 16443, Lincoln has identified no prejudice from that late filing. Accordingly, the Court declines to strike Lopez's unverified answer. (See *Imagistics Internatl., Inc v. Dept. of General Services* (2007) 150 Cal.App.4th 581, 588 ['a trial court has discretion to decide whether to strike a late-filed answer'].")

Lincoln has shown no abuse of that discretion.

Lincoln's last argument is that the "burden of proof is by a preponderance of the evidence,"[9] an argument premised on the language in a 1982 opinion from the Fourth District Court of Appeal: *Pierce v. Harrold* (1982) 138 Cal.App.3d 415. Lincoln's argument simply ignores numerous other cases, many after *Pierce*, holding that the burden is clear and convincing evidence—including, astonishingly, holdings of our Supreme Court. Illustrative is *Wilks*, *supra*, 42 Cal.3d at p. 404—decided after *Pierce*—that the "contestant has the burden of proving the defect in the election by clear and convincing evidence." Indeed, this very District confirmed the proper burden in *DeMiglio v. Mashore* (1992) 4 Cal.App.4th 1260, 1268: "We of course agree that the contestant must prove the defect in the election process by clear and convincing evidence."

---

[9] The argument is introduced with this paragraph: "The trial court ruled in favor of Lopez under any burden of proof. In the event the case is remanded, or the appellate court considers the burden of proof to be significant, [Lincoln] submits this argument. The burden of proof should have been a preponderance of the evidence."

Were all that not enough, we note that Lincoln's argument could not have merit even if he were right, as the trial court found that Lincoln "did not prove by clear and convincing evidence or a preponderance of the evidence that Lopez committed an offense against the elective franchise in violation of section 16100, subdivision (c)."

In a brief paragraph on the penultimate page of his brief, Lopez contends he should be awarded fees and costs on appeal, asserting as follows: "Election contests 'ascertain the will of the people at the polls, fairly, honestly and legally expressed.' (*Friends of Sierra Madre*, *supra*, 25 Cal.4th at [p.] 192.) The cost to defend this case through the present appeal, and thereby vindicate the will of the people, has far exceeded the modest financial benefit Lopez receives as a member of the City Council. Because Lopez and his pro bono counsel have enforced an important public right, Lopez should be awarded his fees and costs on appeal." At oral argument, counsel for Lopez indicated that the request is essentially based on Code of Civil Procedure section 1021.5, the private attorney general doctrine.

Lopez will, of course, be awarded his costs on appeal. We decline to award fees which, we note, were not requested in the trial court or at any time prior to his brief, and moreover based on an issue not briefed by the parties.

## DISPOSITION

The judgment is affirmed. Lopez shall receive his costs on appeal.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


*People v. Rodriguez* (A164251)

| | |
|---|---|
| Trial Court: | San Mateo County Superior Court |
| Trial Judge: | Honorable Danny Y. Chou |
| Attorney for Plaintiff and Appellant, Webster Lincoln: | Mark S. Rosen |
| Attorney for Defendants and Respondents, Antonio Lopez et al.: | McManis Faulkner, Ann Ravel, Tyler Atkinson, Melanie Frakes, Cherrie Tan. |